# PRACTICE REPORTS.

## SUPREME COURT.

### BENJAMIN HOLDEN and others, respondents agt. RICHARD CLANCY and others, appellants.

Where a written contract is entered into between the plaintiffs and defendants by which the latter agree to rent to the plaintiffs a cattle barn connected with the defendant's distillery, for a certain time, and also agree to furnish to the plaintiffs, at the barn, slops from their distillery—One hundred and eighty-three bushels of slops *per diem*, during the term; and the plaintiffs agree to pay for the slops and the rent of the barn, at the rate of nine cents per bushel of the slops furnished, which agreement is carried into execution by the parties according to its terms:

The contract is not one to manufacture or furnish a manufactured article, in the sense that in every sale and purchase of an article to be manufactured, there is an *implied warranty* that the article, when delivered shall be of a *merchantable quality*; nor does an article, designated no otherwise than as " slops from their distillery," constitute a manufactured article within the meaning of the rule which implies a warranty of merchantable quality.

Consequently, an objection made by the plaintiffs pending the contract, that the defendants were buying and using in their distillery damaged grain or grain which had been scorched and injured by fire during the burning of an elevator in which it was stored, the slops from which were injurious to the plaintiff's cattle which they were fattening, could have no force or effect in reference to a recovery upon an implied warranty of the value of the slops.

It is not reasonable to suppose that in contracts for the sale of this refuse material, it is the expectation of either party that the manufacturer is to be controlled in his choice of material or machinery to be used, by any consideration as to the effect which it may have upon the value of the refuse material resulting from the process.

And it seems absurd to suppose there can be, in the absence of express contract or of fraud or imposition, any responsibility for the quality of what is sold as slops or swill. The plaintiffs had what they bargained for, " slops from the distillery," and it would seem reasonable to apply to such a case, the doctrine of *caveat emptor.*

But if there were a warranty of merchantable quality implied in such a sale, the

Holden agt. Clancy.

plaintiffs would not be entitled to recover in this case, since it appeared that they received and consumed the slops from day to day, with a full knowledge of their quality, and without returning or offering to return them, or giving the defendants notice to take them away or not deliver any more. This was a complete waiver of the alleged defects.

*Fourth Department, January Term,* 1871.

MULLIN P. J., JOHNSON *and* TALCOTT, *JJ.*

THIS is an appeal by the defendants from a judgment rendered against them on the report of a referee.

HUNT & GREEN, *for appellants.*

D. PRATT, *for respondents.*

*By the court,* TALCOTT, J.—The facts in this case are substantially as follows : In October 1866, the plaintiffs and defendants entered into a contract in writing by which the defendants agreed to rent to the plaintiffs a cattle barn, connected with the defendants' distillery, till May 1, 1867, and also agreed to furnish to the plaintiffs at the said barn, slops from their said distillery ; one hundred and eighty-three bushels of slops per diem, during the term ; and the plaintiffs agreed to pay for the slops and the rent of the barn, at the rate of nine cents per bushel of the slops furnished, payable monthly. The contract was entered into by the plaintiffs with a view of fattening cattle for market, keeping the cattle in the barn during the winter. The plaintiffs after the making of the contract placed a large number of cattle in the barn, and kept them there during the winter. The defendants furnished the amount of slops from their distillery specified in the contract, and they were received by the plaintiffs daily, and fed to the cattle, and paid for monthly as-specified in the contract. The complaint in the action, after stating the contract and the placing of the cattle in the barn, proceeds to allege that very soon there-after, the defendants, against the dissent of the plaintiffs, purchased damaged grain which was totally unfit for the purpose of manufacturing the slops mentioned in the con-

tract, and used the same in their distillery, and from the same, manufactured and delivered slops to the plaintiffs, which the plaintiffs refused to receive, *as in any way a fulfillment of the contract on the part of the defendants*. And that by reason thereof the plaintiffs have sustained damages.

It appears that during the winter, the defendants purchased and distilled in their distillery a quantity of grain which had been contained in an elevator at Oswego, which had been burned. That a portion of the slops, and perhaps two thirds, furnished to the defendants were the slops from this damaged grain.

And the plaintiffs adduced testimony showing that these slops were full of gravel, ashes and cinders, and were black, and tending to show that they were not fit for the purpose of fattening cattle, and according to some witnesses, were worth nothing at all, whereas good slops were worth from fifteen to twenty cents per bushel.

They also gave evidence tending to show that some of their cattle had gained nothing at all in weight, while the majority of them had gained only an average of 57lbs per head, whereas they should have gained in weight an average of 200lbs. per head. It appeared that the plaintiffs on several occasions complained to the defendants or their agents at the distillery that the slops were not good, and on one occasion threatened to sue the defendants on that account if the cattle did not do well.

Witnesses on the part of the defendants who had used the same slops, testified that the quality was good and that their cattle, fed on them, did well.

The referee finds that the slops furnished the plaintiffs for one hundred and twenty-five days of the time, " was inferior and not merchantable." And that by reason thereof the plaintiffs sustained damages to $1,029 37, for which amount he ordered judgment.

Van Buren, one of the plaintiffs, testified that he " knew the quality of the slops all the time it was being fed to the

cattle." And the referee finds that the payment for the slops was made after they had been received and used by the plaintiffs, and that the plaintiffs did not offer to return any of the slops to the defendants, or give them notice to take any part of them back.

On this state of facts the plaintiffs claim to sustain this recovery, upon the ground that the contract is for the sale and purchase of an article to be manufactured, and that in every such sale there is an implied warranty that the article when delivered, shall be of a merchantable quality. We do not think the agreement in this case is to manufacture or furnish a manufactured article, in the sense of the rule referred to, or that an article designated no otherwise than as "slops from their distillery," constitutes a manufactured article within the meaning of the rule which implies a warranty of merchantable quality. A manufacture is defined as "the process of making anything by art, or of reducing materials into a form fit for use, by the hand or by machinery." And it seems to imply a proceeding wherein the object or intention of the process is to produce the article in question. The residuum or refuse of various kinds of manufactories is more or less valuable for certain purposes. And may be, and often is the subject of sale, but it is not expected that the skill and attention of the manufacturer is to be devoted to the quality of the refuse material. This is not the object of the process, and its quality is wholly subordinate, and disregarded, when attention to it would interfere with the most profitable mode or material to be used in the process which is the main object of the manufacturer.

. It is not reasonable to suppose that in contracts for the sale of this refuse material it is the expectation of either party that the manufacturer is to be controlled in his choice of material or machinery to be used, by any consideration as to the effect which it may have upon the value of the refuse material resulting from the process.

And it seems absurd to suppose there can be, in the absence of express contract and of fraud or imposition, any responsibility for the quality of what is sold as slops or swill. The plaintiffs had what they bargained for " slops from the said distillery," and it would seem reasonable to apply the doctrine of *caveat emptor* to such a sale, if ever.

But if there were a warranty of merchantable quality implied in such a sale, the plaintiffs would not be entitled to recover in this case, since it appears that they received and consumed the slops from day to day, with a full knowledge of their quality and without returning or offering to return them, or giving the defendants notice to take them away or not to deliver any more. This fact, upon well settled principles governing executory contracts of sale, was a complete waiver of the alleged defects. The defendants offered to sell the article at a certain price. The plaintiffs cannot make a different contract for the defendants, or receive and use the article at a less price without their consent, unless prevented from rejecting it by want of knowledge of, or opportunity to ascertain the alleged defects.

It is not improbable from the testimony, that if the plaintiffs had refused to receive and consume the slops in question, the defendants might have obtained the same or a better price from other parties. The case, on this point, seems to be entirely within the principle of *Reed* agt. *Randall*, (29 N. Y., 358); see also *Hoe* agt. *Sanborn*, (21 N. Y., 552, 556,) and *Howland* agt. *Hoey*, (23 *Wend.*, 357.)

Judgment must be reversed, and a new trial must be granted, costs to abide the event.