(C. D. 471)

Standard Oil Co. of Louisiana *v.* United States

United States Customs Court, Third Division

(Decided April 18, 1941)

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel) and *A. M. Curtis* for the plaintiff.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Joseph E. Weil*, special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

KEEFE, Judge: In these suits the plaintiff seeks to recover customs duties assessed by the collector at New Orleans upon certain refinery gases withdrawn for domestic consumption from bonded manufacturing warehouses. Duty was assessed thereon at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, as nonenumerated manufactured articles. The plaintiff claims that the merchandise is dutiable at 10 per centum ad valorem under paragraph 1555 as waste. It is alternatively claimed that the merchandise is dutiable at 10 per centum ad valorem under paragraph 1558 as nonenumerated unmanufactured articles, or that it is free of duty under paragraph 1733 as petroleum, crude, fuel, or refined, or as a distillate obtained from petroleum, or under paragraph 1719 as a mineral, crude, or not advanced in value or condition.

Two witnesses testified for the plaintiff, one being the chief chemist of the Baton Rouge plant, in charge of the refinery laboratory, and the other was the head of the process engineering department of the company whose duties are to survey the refinery operations throughout and to ascertain that every operation is carried on efficiently for the production of the greatest quantity of the most valuable products.

From the uncontradicted testimony of these witnesses we find that crude distillate of petroleum was imported from Aruba, Netherlands West Indies, and placed in bonded manufacturing warehouses where it was later processed. Warehouse entry 11–B covered merchandise that was used in the production of Diesel oil and gasoline, whereas the merchandise under warehouse entry 64–B was used in the production of gasoline. The imported crude distillate is known as "feed stock." The merchandise in the first entry was broken up by means of a series of distillations into the products desired. The method used was as follows: The material was placed under a high pressure at the beginning of the distillation operations and in each succeeding distillation the pressure was reduced until the atmospheric pressure was reached. During each of these operations certain unsought gases were unavoidably formed which were so light that they would not

remain liquid and would not recondense except under great pressure. Consequently these gases escape from the recondensing chamber during the successive stages in the production of the Diesel oil and gasoline and are collected in a gas-collecting line. These light gases are in that manner eliminated from the final products because a product manufactured from the imported "feed stock" would be unstable and unsatisfactory if they remained therein. In order to utilize everything of value in the "feed stock," the plaintiff removed these unsought gases from bond, after being measured under customs supervision, and burned the same under the boilers in the various refineries. Before removal all of the valuable elements contained therein, useful as constituents of the Diesel oil and gasoline, are recovered.

In the latter entry the imported "feed stock" was processed in a manufacturing warehouse for the production of gasoline only. The series of operations performed were similar to the process of the material in the first entry but not identical therewith. As in the previous process, the lighter portions of the gases which would not recondense into a liquid were segregated into a gas-collecting line and withdrawn from the bonded storage warehouse after being metered under customs supervision. In like manner they were also burned in the refinery fuel system.

It further appears from the evidence that it would not be profitable to import raw "feed stock" for the production of these gases only. Such gases are not suitable for use as a gasoline or an oil and are not deliberately sought in the manufacturing operations.

The plaintiff contends that the refinery gases in question come squarely within the term "waste" as that term is defined by the courts, and that the classification of the material as a manufactured article is in conflict with judicial authority.

It is the contention of the Government, on the other hand, that the gases in question constitute a manufactured article within the meaning of the tariff laws, as the article suffers a species of transformation through the application of labor, and is changed into a new and different article, having a distinctive name, character, or use; that the merchandise is not a waste, as the common meaning of the term "waste" does not control its definition for tariff purposes, and the tariff term does not include low-grade materials which may be used in the same manner as articles of the same species but of better quality that are sought in the manufacturing process.

The subject of waste has been before this and the appellate courts many times. The Supreme Court in *Patton* v. *United States*, 159 U. S. 503, 40 L. ed. 233, announced the characteristics of waste, in a tariff sense, in the following language:

The prominent characteristic running through all these definitions is that of refuse, or material that is not susceptible of being used for the ordinary purposes of manufacture. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable.

We bear in mind that there are two classes of waste products treated in the decisions covering waste. One involves a material which is a final residuum remaining after all of the valuable products have been removed therefrom and is in such condition that it has neither the character of the original material nor the products produced therefrom. The other consists of scraps and broken pieces of the original material which ofttimes retains the name and quality of the original product and is used for similar purposes. The latter material was the subject of decision by the Supreme Court in *Latimer* v. *United States*, 223 U. S. 501, 56 L. ed. 223. There small pieces broken from the brittle leaves of tobacco which fall to the floor of the warehouse are recovered and cleaned and are used in the manufacture of a cheap grade of cigarettes and stogies. The court held that such scrap retains the name and quality of tobacco, is in fact tobacco, and therefore is dutiable under a provision for tobacco in all its forms, manufactured or unmanufactured, rather than as a waste. The word "waste" in the tariff act was there defined by the court as generally referring—

to remnants and byproducts of small value that have not the quality or utility either of the finished product or of the raw material.

The product before us clearly is distinguishable from the class of left-over products the subject of decision in the *Latimer* case, *supra*, as it has neither the characteristics of the material placed in bonded warehouses nor the final products sought. It is a refuse which is left over and not susceptible of use either as an oil or as a gasoline. It is the final residuum remaining after all the valuable elements have been extracted. It is not an article which is sought or purposely produced as a byproduct in the industry. It has lost the quality and utility of the original "feed stock" and is not capable of use in the same manner or for the same purposes as the Diesel oil or gasoline extracted from the "feed stock." The gases herein, as entered for consumption, are in the same class of products the subject of decision in the cases following:

In *Willits* v. *United States*, 11 Ct. Cust. Appls. 499, T. D. 39657, the appellate court held that beef cracklings, the refuse or waste remaining after tallow has been cooked out of meat, was a waste.

In *Koons, Wilson & Co.* v. *United States*, 12 Ct. Cust. Appls. 418, T. D. 40589, the dried residue from sugar beets, after the extraction of the sugar, and used for cattle feed, was held to be a waste.

In *Ishimitsu Co.* v. *United States*, 12 Ct. Cust. Appls. 477, T. D. 40672, nigari, obtained in the process of salt making, and constituting

the drippings of moisture from the wet salt, suitable for use and used in the manufacture of a food from soy beans, was held to be a waste.

In the case of *Kamikawa Bros.* v. *United States*, 15 Ct. Cust. Appls. 12, T. D. 42130, the lees or dregs, resulting from the manufacture of a Japanese rice wine, and consisting of an unsought residuum chiefly used for the preservation of fruits and vegetables, were held to be waste. There our appellate court stated:

No manufacturing effort is put forth either to make it or to recapture it. As a matter of fact, the evidence seems to show that the principal problem seems to consist in disposing of it in any way.

In *Masson* v. *United States*, 15 Ct. Cust. Appls. 78, T. D. 42157, the cottonseed pitch or distilled stearine pitch in issue was a residuum resulting from the distillation of black cotton grease in the recovery of the fatty acids or soap stock. The residuum pitch was worth nearly one-half of the value of the soap stock. The court found that the pitch was no longer black grease, nor was it a fatty acid, and that it could not be used for any of the purposes that any of the things from which it came were suitable, and it was held to be dutiable as a waste.

In *Smith* v. *United States*, 21 C. C. P. A. 514, T. D. 46971, the merchandise was mustard dross, which consisted of the residue of the hull or outside part of the bran after the heart of the mustard seed is removed. The product was a coarsely ground or cracked bran-like substance, having very little taste or smell and light yellowish in color. The heart of the mustard seed was used in making the ground mustard of commerce. The mustard dross was also used for culinary purposes, to wit, as a filler for cheap wet mustard together with spices and vinegar in which it is soluble, and in such condition constitutes wet mustard. The court held that the product was properly dutiable as a waste.

In the case of *Cia. Algodonera* v. *United States*, 23 C. C. P. A. 42, T. D. 47686, cottonseed hulls, not further manufactured after separation in the manufacture of cottonseed oil and meal, and necessarily produced in such oil mill operations, even though a valuable product and a distinct commercial entity, was held by the court not to militate against the view that they are, in a tariff sense, waste.

The merchandise before us here, it is true, was used for fuel, and in the sense of being a fuel is in the same class of commodities as the Diesel oil and the gasoline, the products sought in the manufacturing operation. The utilization of the product as a fuel in order to eliminate any waste in the manufacturing processes is insufficient to remove the merchandise from the provision for waste and relegate it to the provision for nonenumerated manufactured articles. All waste products included within the provisions of paragraph 1555 are produced as a result of manufacturing processes, but where the object or intention of the process is to produce Diesel oil and gasoline, the skill

and attention of the manufacturer is not expected to be devoted to refuse material. See *Holden* v. *Clancy*, 58 Barb. 590. In the *Smith* case, *supra*, mustard dross was used in the manufacture of a certain class of mustard, and in some degree was a mustard of commerce. However, being an unsought residuum necessarily produced in the manufacture of ground mustard, it was held to be properly dutiable as a waste product.

Under the alternative claims made in the protests the plaintiff contends that paragraphs 1719 and 1733 of the free list are more specific than the provision for waste. Paragraph 1719 provides for "Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture." It is contended that as the waste gas in question is of less value than the imported "feed stock" the processes undergone did not advance it in value, and therefore it is still a crude mineral. In the case of *Ishimitsu* v. *United States*, *supra*, the court when considering whether or not nigari was a crude mineral stated that: "Crude implies that it is raw, unprepared or in its natural state." Obviously, under the definition of our appellate court, the product in question is not crude in a tariff sense. Nor are we impressed with argument of plaintiff that paragraph 1719 includes articles such as here before us as "not advanced in value or condition" by a process of manufacture. A manufacturing process implies a proceeding wherein the object or intention is to produce the article in question. See *Holden* v. *Clancy*, *supra*.

Paragraph 1733 admits mineral oils free of duty. The paragraph reads:

PAR. 1733. Oils, mineral: Petroleum, crude, fuel, or refined, and all distillates obtained from petroleum, including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for.

It is contended that "Petroleum * * * fuel," aptly describes the merchandise under consideration. Admittedly in the processes applied to the imported "feed stock" certain chemical changes took place. In the case of *Borne Scrymser Co.* v. *United States*, 22 C. C. P. A. 475, T. D. 47465, the court stated that paragraph 1733 was designed to exclude chemical products not the direct result of the distilling and refining of crude petroleum. The waste material herein is not "Petroleum," nor is it a product of petroleum deliberately sought for use as a fuel. Neither is the gas in question a distillate of petroleum, but rather a gas residue remaining after a manufacturing process.

From a careful consideration of the evidence, and following the decisions cited, we hold that the gas in question is a waste having neither the character of the original material nor of the products produced therefrom and is more specifically provided for as a waste,

not specially provided for, under paragraph 1555 of the Tariff Act of 1930, than as crude minerals or petroleum fuel or as a nonenumerated manufactured article.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entries assessing duty upon the refinery gases in question at the rate of 10 per centum ad valoreum under paragraph 1555, act of 1930, and to make refund accordingly.