STANDARD OIL CO. OF LOUISIANA *v.* UNITED STATES (No. 4518)[1]

---

United States Court of Customs and Patent Appeals, March 6, 1946

*Sharretts & Hillis* (*Edward P. Sharretts* and *Samuel M. Richardson* of counsel) for appellant.

*Paul P. Rao*, Assistant Attorney General (*Alfred A. Taylor, Jr.* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

[Oral argument February 6, 1946, by Mr. Edward P. Sharretts and Mr. Taylor, Jr.]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, C. D. 926, affirming the action of the collector of customs at the port of New Orleans in refusing to liquidate certain entries covering withdrawals of petroleum gases classifiable as waste and granting the Government's motion to dismiss appellant's protest on the ground that it was filed more than 60 days after the liquidations were legally made and posted as provided in section 514 of the Tariff Act of 1930 and article 818 (*i*) of the Customs Regulations of 1937 respectively.

There is no dispute here as to the facts and the primary question for determination is whether the bulletin notice of liquidation was posted in a conspicuous place in the customhouse for the information of importers in the form and manner required by law.

Appellant operates a class 6 bonded warehouse in connection with its oil refinery at Baton Rouge, a subport of New Orleans. The material that was imported and manufactured is a petroleum product known as gas oil. It was put through the various manufacturing steps to produce, primarily, a high grade gas oil or gasoline, and the material here in issue is a byproduct or waste gas which could neither be packed nor exported and was withdrawn and used as fuel.

Appellant entered its first withdrawals for consumption as waste dutiable at 10 per centum ad valorem under paragraph 1555 of the Tariff Act of 1930. The acting appraiser who was also the deputy collector of customs at Baton Rouge advisorily classified the gases as entered by appellant, but when the invoice and entry covering the importations were submitted to the headquarters port at New Orleans, the collector there reclassified the material as an unenumerated manufactured article dutiable at 20 per centum ad valorem under paragraph 1558.

Appellant filed a protest claiming the gas to be properly dutiable at 10 per centum ad valorem as waste under paragraph 1555, which protest was sustained by the United States Customs Court. *Standard Oil Co. of Louisiana* v. *United States*, 6 Cust. Ct. 237, C. D. 471. Pending the final decision in that case, the Collector of Customs at New Orleans agreed to withhold the liquidation of all unliquidated entries in accordance with the provisions of article 828 (*h*) of the Customs Regulations of 1937. In the meantime, appellant was obliged to enter the withdrawal of the gas in question at the higher rate of duty.

When the decision in the test case became final, Richard G. Woolfolk, a representative of appellant, supplied the collector with an itemized statement showing the details of 103 unliquidated entries to be liquidated at 10 per centum in accordance with the court's decision. Thereafter the collector proceeded to liquidate or reliquidate the involved entries at 10 per centum and completed the transaction covering 78 of such entries. As to the 24 entries here involved, however, the collector evidently through an oversight attempted to liquidate the entries at 20 per centum which was in contravention of his agreement, the customs regulations, and the court's decision hereinabove cited.

Thereafter, on December 11, 1941, the bulletin notice covering the 24 entries so liquidated was posted in the customhouse at Baton Rouge by the collector, in the form and manner which he "believed rendered them visible to any one interested in them," but the notice

was not discovered by the representative of the importer until more than 60 days after the date of the posting had expired.

The protest subsequently filed and involved herein relates not only to the liquidation of the 24 entries but also to the circumstances involved in the posting of the bulletin notice of liquidation. So far as pertinent to the question in issue, the following testimony is quoted from the transcript of the record:

Direct examination by Mr. SHARRETTS:

Q. Mr. WOOLFOLK, are you connected with the Standard Oil Company of Louisiana?—A. Yes.

Q. What is your position?—A. I am a customhouse broker, and I have to do with the entering and clearing of ships, customs work, and similar related matters.

\* \* \* \* \* \* \*

Q. Now, then, did you make any inquiries here at the Collector's office in New Orleans, or at the Comptroller's office, with respect to those entries?—A. I was here in New Orleans at various times and I inquired at the Liquidator's office when he was going to finish paying me off on those cases, and they told me every time that they were in the Comptroller's office, the ones that hadn't been paid, that they were in the Comptroller's office being verified. I checked again on several occasions when I was down here, and after a considerable time had elapsed and they hadn't been paid I asked again and they told me they were in the Comptroller's office still, so I went in there to find out what was holding them up.

Q. Now, those cases you are talking about are the entries covered by the protest here today?—A. It developed they were the same.

Q. Up to that time he had been liquidating in accordance with the arrangement you had, and was liquidating in accordance with the Court's decision?—A. That is correct.

Q. And then you found that there were some 24, was it, that there was no money coming from, and on which there had apparently been no liquidation, and then what did you do?—A. I went into the Comptroller's office and he said he didn't have any entries in there. On my return to Baton Rouge I investigated up there and found that they had been liquidated and posted.

Q. How did you find out they had been liquidated? What did you do?—A. Why, I——

Q. Do you understand the question?—A. Yes. I made a complete search of the postings and I found them.

Q. You finally found them there on the bulletin board?—A. Yes.

Q. Now, just what way were they on the bulletin board?—A. The 24 entries in question were on a bulletin, or a liquidated bulletin dated December 11th. Covering that day's transactions there were three sheets of the bulletin prepared. One sheet was headed "Warehouse Reliquidations", and there was a number of reliquidations of entries of this same material on that sheet. Then, immediately beneath it was another sheet—I don't recall exactly how that was headed up, but it had various entries posted as being liquidated, among which were the 24 here in question. There was no number on the first sheet to indicate there were following sheets covering that day's business, and the first sheet was signed, indicating, according to the usual practice, that that was all the transactions for that date. There never had been an instance before where they had a posting similar to that.

Q. On this top sheet which you referred to, was that the top sheet on the bulletin board as you looked at it?—A. It was superimposed over those other two at the time I looked at it.

*    *    *    *    *    *    *    *

Q. So that, as I understand it, on the first top sheet that list of entries there are all of these waste gases of the kind covered by the test case and were all liquidated in accordance with that decision, is that correct?—A. That is correct.

Q. While on the second and third sheets there were other entries of the same kind of merchandise that were liquidated at 20 per cent as nonenumerated manufactured articles, is that correct?—A. The ones in question.

Q. What?—A. The entries in question were so liquidated.

Q. Mr. Woolfolk, how long have you been examining entries and working up liquidations and so forth for the Standard Oil Company of Louisiana?—A. Since September, 1922, I began with them, doing that particu[l]ar type of work.

Q. Now, during that period, have you had occasion to examine the bulletin notices of liquidations at Baton Rouge?—A. Yes, sir.

Q. Have you had occasion to note them at the port of New Orleans?—A. Yes. I visit New Orleans at frequent intervals and when I have business to attend to I note them.

Q. You have been noticing the way they have noted the liquidations at the port of New Orleans and at the port of Baton Rouge?—A. Yes.

Q. During your entire experience have you ever known any liquidations to be noted exactly the way these are, where there is one sheet signed by the Deputy Collector on the top and other sheets underneath that that were not in any way referred to on the top sheet?—A. Up to the time of that posting of that liquidation there never had been, to my knowledge, any such posting, nor have I seen any afterwards done in that manner.

Q. You haven't seen any?—A. I never have seen anything like it.

Q. Now, when you finally did end up, after you had been to the liquidator's and comptroller's offices down here and finally returned to Baton Rouge and then looked through the bulletin notices, can you tell me how far back were the liquidations on that bulletin board, do you recall?—A. The bulletin board had entries back to somewhere in the range of 1935. I can't be precise.

Q. One on top of the other?—A. That is so.

Q. Now, how did you go about examining those bulletins? What did you do?—A. At the time a posting was made there the bulletins were fastened to an ordinary clip board, which was in turn screwed to a bulletin board against the wall. This bulletin board was in a recess approximately two feet deep. Immediately in front of the bulletin board was a small safe, that is, in front of it and below it, and on the right hand side of it was a six-foot cupboard, about two feet in depth, and on the left hand side there was a filing cabinet approximately four feet high and two feet deep, and in between this cupboard and this filing cabinet, as I said, is this small safe, which was about eighteen inches high, as near as I can remember, which made it necessary for you to lean over the safe and attempt to check your entries. You couldn't do it without holding up the entries with one hand and using the other hand to pick out the entries you were looking for. You were in a stooped position in an alcove just about two feet in depth, and the actual bulletin board containing the postings was hard against this cupboard, making it very awkward to get at.

*    *    *    *    *    *    *    *

Q. I don't want you to repeat your testimony unnecessarily, but I understand your testimony is that this was the first time in your experience that the liquidations and reliquidations had been posted as they are here on Exhibits 4 and 5?—A. Yes. Before this posting they had all been——

Q. (Interposing): I mean except this particular one. Throughout your entire experience:—A. That was what I wanted to make clear. Before that it had been

the practice both at New Orleans and at Baton Rouge to list all of the entries and have the different categories set forth by headings, so that you had Page 1, 2, and 3, as many sheets as it took to post the day's business, and the entries were classified as free entries or withdrawals for consumption or the different categories listed right down on the same bulletin.

Q. Where would the signature be?—A. At the end of them.

Q. The end of the postings?—A. At the end of the entire list of liquidations of that day.

Mr. Sharretts: That is all.

Cross-Examination by Mr. Welsh:

\*    \*    \*    \*    \*    \*    \*

X Q. When was the first time you saw them at all on the bulletin board?—A. I don't remember precisely.

X Q. Wat [was] it within the sixty days?—A. No.

X Q. It wasn't within the sixty days——A. (Interposing) May I correct myself on that? I think I saw the top sheet on the reliquidations and checked it off against my record.

X Q. When?—A. Sometime immediately following the reliquidations.

X Q. You mean you went to the bulletin board within sixty days of December 11th and looked at that sheet?—A. Yes, sir.

X Q. So that if you had just raised the top sheet you would have found those liquidations, wouldn't you?—A. It is posssible.

\*    \*    \*    \*    \*    \*    \*

Herbert V. Kelley, of Baton Rouge, La., called as a witness for the Plaintiff having been duly sworn, testified as follows:

Direct examination by Mr. Sharretts:

Q. Mr. Kelley, what is your official position?—A. Deputy Collector of Customs in charge, Baton Rouge, Louisiana.

Q. Do you have any duties of appraiser there?—A. I am also Acting Appraiser at Baton Rouge.

\*    \*    \*    \*    \*    \*    \*

Cross-Examination by Mr. Welsh:

X Q. Mr. Kelley, the entries in this protest were all filed at Baton Rouge and received by you?—A. Yes, sir.

X Q. You forwarded the necessary papers to New Orleans, did you not?—A. I did, yes.

X Q. To your headquarters port at New Orleans?—A. Yes, sir.

X Q. Did the Collector's office at New Orleans prepare the liquidations?—A. Yes, sir.

X Q. And they transmitted them to you?—A. Yes, sir.

X Q. And what did you do with them?—A. They were transmitted accompanied by a bulletin notice of liquidation which, after being checked against the schedules in my office, to determine whether they were all returned, was placed on the bulletin board described by Mr. Woolfolk.

X Q. Now, that bulletin board had been located in the office high up on the wall for a long period of time, hadn't it?—A. Not high up on the wall.

\*    \*    \*    \*    \*    \*    \*

X Q. What has been your custom as to notifying Mr. Woolfolk as to the posting of entries, well, we will say, for the last five or six years?—A. Well, it should be understood that Mr. Woolfolk's office was within thirty-five yards of the collector's office at Baton Rouge. The customs office is located in the Main

office building of the Standard Oil Company, and, naturally, we had quite a number of official contacts. He spent a good part of his day in the collector's office, and what we had most to discuss was the customs business of the Standard Oil Company. It was my practice to point out to him any matter of interest to the Standard Oil Company that had come through my office, and it could be said, of course, that it was my practice to call his attention to all liquidations that were posted on the board.

X Q. Do you have any independent recollection as to whether or not you specifically directed his attention to the liquidations that were posted on December 11th?—A. In this instance, no.

\* \* \* \* \* \* \*

X Q. They were posted in a manner, on the bulletin board, which you had previously directed Mr. Woolfolk's attention to?—A. They were posted in a manner which I believed rendered them visible to any one interested in them.

Section 514, as it is here applicable, provides that a liquidation of any entry by the collector of customs shall become final and conclusive upon all persons including the United States and any officer thereof unless the importer shall, within 60 days after, but not before such liquidation, file a protest in writing with the collector setting forth distinctly and specifically the reasons for his objection thereto.

Section 505 of the Tariff Act of 1930 provides that in making a liquidation the collector not only shall ascertain, fix, and liquidate the rate and amount of duties to be paid on the merchandise covered by the involved entries as provided by law but also he shall give notice of such liquidation in the form and manner prescribed by the Secretary of the Treasury. See *United States* v. *B. Holman, Inc.*, 29 C. C. P. A. (Customs) 3, C. A. D. 164.

In conformity with that section of the tariff act the Secretary of the Treasury promulgated article 818 (*i*) in which he prescribed that upon the return of entries to the collector after the assessment of duties and internal revenue taxes has been verified by the comptroller, formal entries shall be immediately scheduled on a bulletin notice of liquidation, customs Form 4333, and that the bulletin notice shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers and shall be dated with the date of posting.

The provisions of section 505 are mandatory and give no discretion to collectors of customs either as to the form or manner of such notice and the provisions of article 818 (*i*) requiring collectors of customs to post bulletin notices of liquidations "in a conspicuous place in the customhouse for the information of importers" has the force and effect of law. See *United States* v. *Astra Bentwood Furniture Co.*, 28 C. C. P. A. (Customs) 205, C. A. D. 147.

As to the significance of the provision in the customs regulations that the bulletin notice of liquidation shall be posted in a conspicuous

place in the customhouse, Webster's New International Dictionary, Second Edition, 1939, contains the following pertinent definitions:

**bulletin,** *n.* 1. A brief or condensed statement of news to the public, esp. as issued by an acknowledged authority   *   *   *

**notice,** *n.* 1. Information; intimation or warning, esp. of a formal nature   *   *   *

**post,** *v. t.*; posted; posting.   *   *   *   2. To affix to a post (as, esp. formerly, before a sheriff's office or in some other public place), wall, or other usual place for public notices; to placard; as, to *post* a notice.

**conspicuous,** *adj.* 1. Obvious to the eye or mind; plainly visible; manifest.   *   *   * 2. Attracting or tending to attract attention, as by reason of size, brilliance, contrast, or station; striking; eminent   *   *   *

**visible,** *adj.* 1. Perceivable by the eye; capable of being seen; perceptible to sight; as, a *visible* star.

The definitions hereinbefore noted establish beyond a doubt that when the Secretary of the Treasury prescribed that the bulletin notice of liquidation shall be posted in a conspicuous place in the customhouse, he contemplated that such a notice shall be posted there in a place where such notice by reason of its position would be not only obvious to the eye of the ordinary prudent person but also that it would strike his attention in the form and manner that the information or warning publicly issued by an acknowledged authority was intended to communicate.   There is nothing in either the language of the statute or the customs regulations by which the collectors of customs may discharge their legal obligation by posting the bulletin notice of liquidation not in a conspicuous place but otherwise in a place from which the notice is visible only after a careful search by an interested person.

It is true that the appellant's representative is an experienced employee and that he knew that the bulletin notices of liquidation were usually posted in a small recess in the wall of the customhouse some few feet above the floor and that it was awkward to get at them because of the intervening office equipment consisting of a file, a cupboard, and a small safe.   He searched for but did not see the involved notice of liquidation prior to the date of the expiration of the 60 days after the notice had been posted by the collector in the form and manner hereinbefore described.

In order to inspect a notice of liquidation in the customhouse at Baton Rouge, according to the record, it was necessary for any interested person to lean over a safe in a stooped position in the small alcove there and attempt to check the entries by holding up the list with one hand while using the other hand to pick out the entries for which he was looking.

One of the reasons why the involved notice of liquidation did not attract the attention of the importer's agent was that the notice was inserted between a superimposed partly filled top sheet, which contained 35 of his liquidated or reliquidated test-case entries, and a pile

of other previously liquidated notices which had been accumulated there over a period of years. The involved notice thus became a part of the submerged pile of accumulated notices.

There was no notation of any kind on the superimposed top sheet to indicate that it was but one of a series of sheets containing an extended list of additional liquidations. In fact, the top sheet in accordance with the administrative practice of the customs office over a period of years was signed at the bottom with the signature of the collector which had theretofore been placed only at the end of the bulletin notices of liquidation to indicate that the entries listed thereinabove were all that had been liquidated on that particular day by the customs officials.

Furthermore, no reference was made to the superimposed top sheet on either of the two additional sheets, marked 1 and 2, which contained the notice of liquidation of the 24 entries. In other words, the involved bulletin notice of liquidation was not posted in a conspicuous place in the customhouse for the information of importers but was posted there in a manner which was not only obscure but also misleading.

The importer's agent having failed to see the notice of liquidation conducted an aggressive campaign on his part in an effort to secure a refund of the money erroneously exacted by the Government from his employer. Time and again he made inquiries at the customhouse in New Orleans, where all entries were liquidated, as to when the collector "was going to finish paying me off on those cases, and they told me every time that they were in the Comptroller's office, the ones that hadn't been paid, that they were in the Comptroller's office being verified." Finally, the customs officials at New Orleans told the agent that they did not know where these liquidations were.

Upon receipt of that information the agent returned to the customhouse at Baton Rouge and, as correctly stated in the opinion of the court below, "made a careful search of the published notices and found that there had been a posting." Meanwhile, the importer's time to protest the erroneous liquidations had long since expired. There is no evidence that the officials of the Government had the slightest intention to deprive the importer of its legal rights or to mislead it in any way. What has happened in this case is due, no doubt, to oversight in the pressure of administrative affairs in the collector's office.

However, the record clearly establishes that the collector in this particular instance failed to give notice in the form and manner prescribed by the Secretary of the Treasury and therefore the involved entries have not been liquidated as required by law.

In view of that conclusion, it is unnecessary to discuss and pass upon other points raised here by appellant.

The Government does not dispute the fact that all the equities in this case are with the importer and from what has been hereinbefore stated it should be apparent that its position here is also supported by the law. Under the circumstances it is the duty of the collector to complete his liquidation of the involved entries in the form and manner provided by law so that the importer, if it sees fit to do so, may protest the liquidation within the time prescribed by section 514. *United States* v. *B. Holman, Inc., supra.*

For the reasons stated, the judgment of the Customs Court dismissing the appellant's protest as untimely is *affirmed.*