KAMIKAWA BROS. *v.* UNITED STATES (No. 2826)[1]

[1] T. D. 42130.

United States Court of Customs Appeals, April 4, 1927

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellants.
*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter* and *Peter A. Abeles*, special attorneys, of counsel), for the United States.

[Oral argument January 27, 1927, by Mr. Igstaedter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, and HATFIELD, Associate Judges, BLAND, Associate Judge participating in the decision by agreement of counsel

GRAHAM, Presiding Judge, delivered the opinion of the court:

The material involved in this appeal is known as *sake* lees, and is a product resulting from the brewing of a Japanese fermented liquor called *sake*. It was imported March 17, 1922, and was classified for duty by the collector under paragraph 385 of the tariff act of October 3, 1913, as a "manufactured article not specially provided for." The importer protested, claiming the goods to be properly classifiable as a crude vegetable substance under paragraph 552, or as waste at 10 per centum under paragraph 384, or as an unenumerated, unmanufactured article at 10 per centum under paragraph 385, of said act. The Board of General Appraisers, on appeal, sustained the classification of the collector, and from that judgment the importer appeals.

On the hearing before the board one witness was called, K. Togasaki, a Japanese. In addition to this, a sample of the goods and an affidavit of one K. Otaki, a Japanese brewer, were offered and received in evidence. From these it appears that the imported material is a finely ground, brown, cake-like substance, having a very noticeable pungent, sour odor. The affidavit of K. Otaki thus describes the process of making *sake* and *sake* lees:

2. That in brewing sake the only materials used are rice, water, moyashi, and yeast; that the rice is softened or gelatinized by heating in water, which kills the germ of the grain; that on this softened rice are shown the spores of a fungus or mold known as aspergillus oryzae, this being done by mixing the rice with moyashi which is a culture of aspergillus oryzae produced on softened rice grains and which is represented by the accompanying sample marked "Exhibit A, affidavit of K. Otake;" that under required conditions of heat and moisture the entire mixture of rice, water, and moyashi becomes a moldy mass in which each grain of rice has been inoculated and covered over with the mold above named, producing a substance known as koji; and that in the course of the sake-brewing process rice softened by being steamed is further added, as well as a fermenting agent consisting of a fungus which in some breweries is a wild yeast but in the practice of affiant is a pure culture of fungi known as saccharomyces sake.

3. That the object of using the rice is (1) to furnish a favorable soil or medium for the development or growth of mold, which mold supplies a diastase necessary for the conversion of starch into sugar, and is (2) for the purpose of supplying a starchy material which under the action of the diastase is converted into sugar,

which sugar is then by fermentative action of the aforementioned yeast changed into alcohol.

4. That in the processes above stated the fungi (aspergillus oryzae and saccharomyces), which develop in great abundance, are not themselves convertible into starch, sugar, or alcohol; and that after a pressing process that is employed for the purpose of thoroughly separating the sake from the dregs, these mold and yeast plants, together with unconverted starch and small amounts of unidentified substances, constitute a residuum known as sake no kasu or sake dregs.

5. That affiant is experienced in the use of the microscope for the examination of fungi used in sake brewing; that he has frequently examined sake no kasu under the microscope as well as by analysis and has found it to be composed approximately by weight as follows:

Starch _____ 50% to 60%
Water _____ 20% to 25%
Fungi _____ 5%
Rice fiber, dust, etc _____ 10% or more

except that after a period varying from one to three or four months, according to climatic conditions, the starch is in part converted into sugar by diastatic action resulting from the association of the mold fungus with the starch.

The testimony further shows that the imported material is used quite extensively for the preservation of fruits and vegetables and in some instances to flavor fish. It is sold by the breweries to stores and then resold for preserving purposes. When produced in small quantities, it is sometimes thrown away. The witness Togasaki testified in part:

Q. Is it treated, are these sake dregs treated in any way after the sake is squeezed out?—A. No.

Q. Is it part of the design of the people who make sake to see if they can not get some sake dregs too?—A. No, they make sake and the dregs is left over as waste.

\* \* \* \* \* \* \* \*

Q. You do not know then what they do with the sake they sell to you?—A. Sake dregs?

Q. Sake dregs.—A. So many people speak about it and all the breweries are trying to make something out of it for some other purpose, but they could not find it, because if they find some other way they can make plenty of money. But so far they can not find anything except to sell it for preserving purposes; something like that.

Counsel for appellant, in his brief and argument filed herein, does not insist upon any claim made by appellant in the court below except that made under paragraph 384 as "waste." We shall therefore confine ourselves to a discussion of the question whether the imported material is dutiable as an unenumerated manufactured article under said paragraph 385 or as waste under said paragraph 384.

We think this case is controlled by *Willits & Co.* v. *United States*, 11 Ct. Cust. Appls. 499. In the case cited, beef cracklings were imported, which consisted of compressed cakes of scrap material left after the grease and tallow had been removed therefrom by cooking and hydraulic pressure. While the material thus imported was not used as imported, it was shown that it was thereafter crushed

and sold for chicken feed. The court, after reviewing the authorities, made the following statement:

We think that the present merchandise answers to the definitions of waste enunciated by the foregoing authorities. The imported article, in fact, is refuse which is left over in the meat-packing industry; it is a material which is not susceptible of being used in the ordinary operations of a packing house; it is a final residuum remaining after all of the valuable elements for packing purposes have been extracted from it; it is not an article which is sought or purposely produced as a by-product in the industry; to the contrary, it is reduced in quantity to the lowest possible minimum as an unsought residuum; it has lost the quality and utility of meat both as a raw material and as a finished product, and the use to which it is finally put is foreign to the ordinary use of either raw or preserved meat. The article, furthermore, was not processed after it became a waste, as in the case of Malouf v. United States (1 Ct. Cust. Appls. 437; T. D. 31502). These incidents serve to distinguish the present case from those relating to materials which, while low grade, nevertheless continue to possess the characteristics of their original estate, as in the cases above cited, and also from those relating to valuable by-products which are designedly sought as desirable subsidiary products in manufacturing operations.

Another similar case was *Koons, Wilson & Co.* v. *United States,* 12 Ct. Cust. Appls. 418, involving sugar-beet pulp. This was the dried residuum left after the sugar had been extracted, and was classified as waste under said paragraph 384. It was shown that the pulp, after being imported, was ground and used for cattle feed, and thereby became a product of some commercial value. The importer claimed it to be free of duty under paragraph 552 of said act as a crude vegetable substance. It was held to be waste, the court basing this conclusion in large degree upon *Willits & Co.* v. *United States, supra.*

Again, in *Ishimitsu Co.* v. *United States,* 12 Ct. Cust. Appls. 479, the court had before it a Japanese product known as *nigari.* This was a by-product from salt making. Sea water was spread upon the sand and, when it was evaporated, the salty crust was scraped up, boiled with sea water in pans, and the residuum was then placed in suspended drainage baskets. The fluid which drained therefrom was saved and constitutes *nigari,* a product which is used in Japanese cookery for flavoring. The court says:

It is shown in this case that the object of the manufacturing process is to produce salt and that the production of nigari is only an incident of the salt making; that in the production of the nigari there was no manufacturing effort put forth for the purpose of producing nigari. Under the decisions of this court, too numerous and too much in general agreement to require citation, we do not think the importation is a manufactured article.

These cases are to be distinguished from *Meyers & Co.* v. *United States,* 10 Ct. Cust. Appls. 216, and *American Smelting & Refining Co.* v. *United States,* 12 Ct. Cust. Appls. 212. In the first case cited, lignum extract, a by-product from the manufacture of sulphite wood pulp, was involved. It was shown this liquid was in the first

instance produced as a waste. Afterwards, however, it was subjected to several manufacturing processes so that, after the last process, it became suitable for use in tanning. It was held that the material was not "waste," within the meaning of said paragraph 384.

In the second case cited arsenical flue dust was involved. This was a by-product of lead-smelting operations, was inseparably connected with the same, and consisted of finely powdered dust containing various elements, which was deposited in the flues of the furnaces during smelting. It was shown that elaborate mechanical processes were utilized for the recapture of this dust in the smelters and that, after recapture, the dust is used in the manufacture of arsenic or arsenious acid. The court said:

> The testimony also fails to sustain the claim that the imported article is a waste dutiable at 10 per cent ad valorem under paragraph 384, supra. It is rather a by-product, which is produced by means of special and even elaborate manufacturing processes for its own value as a separate tariff entity and article of commerce. The by-product thus obtained is of itself a manufactured article, or at least is partly manufactured, and is not a raw or unmanufactured article under paragraph 385, supra. (Standard Varnish Works *v.* United States, 59 Fed. 456; Shallus *v.* United States, 155 Fed. 213.)

It is very evident that the material in question in this case at bar is a waste. No manufacturing effort is put forth either to make it or to recapture it. As a matter of fact, the evidence seems to show that the principal problem seems to consist in disposing of it in any way. The fact that it may have some commercial value does not alone remove it from the classification of waste. It has neither the characteristics of the raw material nor of the finished product and is unsuited for the purposes of either. It is therefore waste and should have been classified as such. The judgment of the Customs Court is therefore reversed and the cause remanded.

*Reversed* and *remanded.*