Werner G. Smith Co., Div. Archer Daniels Midland Co. *v.*
United States (No. 4705) [1]

[1] C. A. D. 503.

United States Court of Customs and Patent Appeals, December 17, 1952

*Eugene R. Pickrell* (*Michael Stramiello, Jr.* of counsel) for appellant.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard F. Weeks* and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.

[Oral argument October 8, 1952, by Mr. Pickrell and Mr. Weeks.]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, COLE, and JACKSON (retired), Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, pursuant to its decision, C. D. 1357, over-ruling the protest of appellant, the importer, and affirming the collector's classification of an importation of crude tall oil, invoiced as "liquid rosin."

The oil was classified by the collector as a nonenumerated manufactured article, dutiable at 20 per centum ad valorem, under paragraph 1558 of the Tariff Act of 1930. In its protest, the importer claimed that the merchandise was classifiable in the alternative as (1) a waste not specially provided for at 7½ per centum, under paragraph 1555 of the 1930 act, as modified in T. D. 49753 and T. D. 50797; or (2) as a nonenumerated unmanufactured article, under paragraph 1558 of that act, at 10 per centum ad valorem; or (3) as a rosin, under paragraph 90 of said act, as modified in T. D. 50797; or (4) under the provision for natural resins, etc., under paragraph 1686 of the 1930 act.

The trial court ruled adversely on all alternative claims of appellant and held the collector's classification to be proper. On appeal before this court, appellant has abandoned the latter two claims and relies only upon claims (1) and (2).

At the trial, appellant produced three witnesses and the Government, four. Numerous exhibits were introduced in evidence by both sides. The pertinent testimony of each witness and the pertinent exhibits of record are accurately reviewed in such detail in the decision of the trial court that we consider it unnecessary to set them out in detail here. We will, however, set forth such parts of the record which we think essential to a complete understanding of the issues before us.

The record shows that the merchandise is crude tall oil [1] imported from Sweden. The oil is obtained from pine wood in the alkaline paper pulp industry. According to testimony of witnesses for both parties, it is obtained by the same process in the United States and Sweden.

In this process, pine wood chips are cooked in a chemical solution of sodium hydroxide and sodium sulphide in a "digester" to produce turpentine yielding gases, which are drawn off, wood pulp, the main desired product, and a liquor in which the rest of the materials in the wood are dissolved. The pulp is separated and washed with water, and the washings combined with the said liquor to constitute what is known in the trade as "black liquor." The black liquor is concentrated by evaporation and then stored in settling tanks so that insoluble alkaline soaps of fatty and rosin acids in the black liquor float to the surface. These soaps, which are known as "skimmings," are drawn off and constitute the material from which the crude tall oil is produced.

The skimmings are allowed to settle in a storage tank to remove occluded black liquor, and the settled skimmings are then treated with sulfuric acid. The sulfuric acid chemically reacts with the soaps,

---

[1] "Tall" means "pine" in Swedish. "Tall oil" has also been called "liquid rosin," as invoiced, but the record indicates that the latter designation is now regarded as obsolete.

which are sodium salts of fatty and rosin acids, to yield fatty and rosin acids plus a residue which is primarily sodium sulfate. This is the principal reaction during this step in the process, although there is some testimony in the record that other reactions take place, the nature of which is not well known. The crude tall oil, comprising the fatty and rosin acids plus a small amount of unsaponifiable material, rises to the top and is separated by flotation. It is usually then settled further, dried, and sometimes filtered.

The pertinent statutory provisions read as follows:

Par. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Par. 1555 [as modified]. Waste, not specially provided for, 7½ per centum ad valorem.

Appellant presents two distinct contentions in support of its claim that the imported crude tall oil is a waste within the purview of paragraph 1555.

Firstly, appellant contends that the tall oil is a waste because it is a refuse left over in the production of wood pulp. This contention appears to be based on the grounds that the black liquor and skimmings, from which the tall oil is made, were once burned or thrown away; that the presence of the ingredients of the tall oil in the wood pulp is undesirable, and an attempt is made to eliminate them as much as possible; and that the principal use of tall oil, in the paint industry and for core oils in the foundry industry, is foreign to the ordinary use of wood pulp. In support of this argument, appellant refers us to *Willits & Co.* v. *United States*, 11 Ct. Cust. Appls. 499, T. D. 39657, *Kamikawa Bros.* v. *United States*, 15 Ct. Cust. Appls. 12, T. D. 42130, and *Masson* v. *United States*, 15 Ct. Cust. Appls. 78, T. D. 42157, which he asserts are controlling here.

In the *Willits* case, which was cited as controlling in the *Kamikawa* and *Masson* cases, this court held that beef cracklings, the final residue of meat packing plants, pressed into cakes to be ground for use in poultry feed, were dutiable as a waste and not as a nonenumerated manufacture. The court there stated, *inter alia*, that "it is not an article which is sought or purposely produced as a by-product in the industry." We think the record clearly indicates that crude tall oil produced by processing skimmings is an article of commerce in both the United States and Sweden, and that a number of plants have been built in both countries to purposely produce this oil as a by-product of their sulfite wood pulp industries. The Government introduced in evidence, as Exhibit 8, a photograph of a crude tall oil plant in the United States from which it is apparent that appreciable effort, equipment, and financial expenditure are devoted to purposely

producing tall oil from black liquor and skimmings. Since testimony by one of appellant's witnesses indicates that tall oil is produced in substantially the same way in the United States and Sweden, we infer from this, in the absence of evidence to the contrary, that this is also true of tall oil production in Sweden. Indeed, since black liquor and skimmings were once burned or discarded in Sweden, as appellant has pointed out, we cannot help but conclude that their subjection to the above-described process was to purposely produce tall oil as a by-product of value in the pulp industry.

Irrespective of whether or not skimmings *per se* are a waste within the purview of paragraph 1555,[2] it is our opinion that the imported crude tall oil is not a waste within the purview of that paragraph because the record shows that, unlike the importations in the cases cited by appellant, the tall oil is a purposely sought by-product of the sulfite wood pulp industry produced by means of a special manufacturing process [3] for its own value as a separate article of commerce. *American Smelting & Refining Co.* v. *United States*, 12 Ct. Cust. Appls. 212, T. D. 40226; *American Smelting & Refining Co.* v. *United States*, 16 Ct. Cust. Appls. 46, T. D. 42718. See also *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. (Customs) 232, T. D. 48668. Accordingly, we do not agree with this contention of appellant.

Secondly, appellant contends that the imported merchandise is classifiable as a waste, under paragraph 1555, by virtue of the doctrine of legislative ratification of judicial construction. In 1933, in the case of *Baird & McGuire, Inc.* v. *United States*, 64 Treas. Dec. 255, T. D. 46638, the Customs Court held that an importation of "liquid rosin," allegedly identical with that at bar, was dutiable as a waste not specially provided for under paragraph 1457 of the Tariff Act of 1922, and not as a nonenumerated manufactured article under paragraph 1459 of that act.[4] Congress reenacted paragraphs 1457 and 1459 in identical language as paragraphs 1555 and 1558 in the 1930 act. Appellant argues that Congress presumably had knowledge of the *Baird* decision interpreting the provisions of these paragraphs, as applied to the merchandise at bar, when it enacted the Customs Administrative Act of 1938; that the act of 1938 not only amended certain administrative provisions of the 1930 act, but also changed certain of its duty-levying provisions; and that by enact-

---

[2] The question of whether or not the skimmings as such are a waste within the purview of paragraph 1555 is not before us, and hence we do not decide it. We note, as a matter of interest, that the record discloses that skimmings as such are an article of commerce in the United States, being sold by paper pulp manufacturers to producers of crude tall oil. One of appellant's witnesses testified that skimmings were not sold as such in Sweden.

[3] Our reasons for regarding tall oil as produced by a manufacturing process are set forth in detail below.

[4] We note at this point that the court held in the *Baird* case that the merchandise in question was the result of a manufacturing process, and hence was not an unenumerated unmanufactured article under paragraph 1459 of the 1922 act.

ment of that act there was legislative ratification of the *Baird* decision. He refers us to House Report No. 1429, 75th Congress, 1st Session, of the Committee on Ways and Means, and Senate Report No. 1465, 75th Congress, 3rd Session, of the Senate Finance Committee on the 1938 act, wherein the respective committees point out that some of the few changes in dutiable provisions included in that act were made to specifically negate certain decisions by the customs courts,[5] and to sanction others.

Counsel for appellant concedes that there is nothing within the Administrative Act of 1938, or in the above reports, specifically referring to the *Baird* decision, or to its effect on the provisions of paragraphs 1555 and 1558 of the 1930 act, which correspond to paragraphs 1457 and 1459 of the 1922 act. Yet, counsel contends that the failure of Congress to change the naturally ensuing results of the *Baird* decision created an implied legislative ratification of the Customs Court's construction of the statutory provisions now before us. For reasons hereinafter set out, we deem this latter contention to be without merit.

One argument advanced against this contention by Government counsel is that the record in the *Baird* case does not show that the liquid rosin there involved was produced by the same process as in the case at bar. It appears from an examination of the *Baird* decision and the record in that case that the import was liquid rosin, a by-product obtained from crushing wood into pulp in the manufacture of paper, and used as a base for making varnish. Testimony in that case established that the liquid rosin was a thick heavy liquid of the consistency of thick molasses and comprised a mixture of "rosin, rosin oil and fatty acids."

We find the record in the *Baird* case is scant and incomplete with respect to the nature of the imported merchandise itself. Moreover, there is no evidence whatsoever in that record as to the process by which it was produced, which we regard as essential to determination of the questions before us. For these reasons, we think it is highly questionable whether it is possible to determine that the classification of the liquid rosin in the *Baird* case disposes of the classification of the crude tall oil in the instant case. However, we will *assume*, for the purpose of this decision, that the importations in both cases are identical and produced by the same process, described above.

Generally, where a given term in a tariff statute has been judicially construed by the courts and thereafter reenacted in substantially the same language in a subsequent tariff act, Congress is presumed to have been familiar with the construction and ratified it, unless a contrary legislative intent is evident. *August Bentkamp* v. *United States,*

---

[5] Insofar as we can determine from an examination of these reports and the committee hearings, all such decisions were by this court, and none by the Customs Court.

40 C. C. P. A. (Customs) 70, C. A. D. 500, and cases cited and discussed therein; *United States* v. *Kawahara*, 15 Ct. Cust. Appls. 231, which is cited at 59 C. J. 1063 [§ 625 (b), n. 41]. However, it is stated in the cited section of Corpus Juris that the general rule does not apply where the old and new statutes are essentially dissimilar. Before a court will apply the principle that an expression in a statute must have the same construction given to it under a prior act, the expression with substantially the same limitations must have been reenacted. 59 C. J. 1064. Although the cases cited in support of these qualifications to the general rule are state court decisions, which are not binding on us, we regard these qualifications as sound in principle and therefore adhere to them.

The Customs Administrative Act of 1938 is essentially dissimilar from the tariff acts of 1930 and 1922 insofar as the provisions here involved are concerned. Senate Report 1465, *supra*, states on page 6 that the primary purpose of the 1938 act is to amend certain administrative provisions of the Tariff Act of 1930 in order to facilitate efficient administration of the customs laws. Statements of similar import are to be found on pages 1 and 2 of House Report 1429, *supra*. Moreover, Senate Report 1465 states further, at page 6:

* * * As its title indicates, the bill is an administrative bill. It does not deal with duty rates and all attempts to make duty amendments to it were vigorously repelled by your committee, as they were in the House by the Ways and Means Committee. * * *

Those statements in the committee reports are reflected in the act itself. The 1938 act is almost entirely devoted to administrative provisions. Of the many thousands of provisions in the dutiable schedules and free list of the 1930 act, only a few have been changed. Neither paragraph 1555 nor 1558 was reenacted. Moreover, there is no evidence whatever that those paragraphs or the *Baird* decision were even considered by Congress when the 1938 act was passed.

For these reasons, we conclude that the qualifications rather than the general rule are controlling, and the doctrine of legislative reenactment of judicial construction is therefore not determinative of the classification of the tall oil here involved. To hold otherwise in these circumstances would, in our opinion, be an illogical application of the doctrine of presumed legislative ratification of judicial construction, far beyond the scope of any decisions extant.

Even if we were not to so hold for these reasons, legislative ratification of the construction in the *Baird* decision would not be decisive in this case for another reason.

There is a presumption of legislative ratification of judicial construction by virtue of a single reenactment of an act in substantially the same language after an unappealed decision of the Customs Court, or its predecessor the Board of General Appraisers. *United States* v.

*Illfelder & Co.*, 9 Ct. Cust. Appls. 40, T. D. 37901. But, although highly persuasive, the presumption is not necessarily a strong one in the absence of evidence showing actual knowledge by Congress of such decision, since that tribunal is not the court of last resort. See 59 C. J. 1061, 1064 [§ 625 (b)]. In view of the relatively small number of decisions of the Court of Customs and Patent Appeals which are reviewed by the Supreme Court, we think it proper to regard this court as the court of last resort within the meaning of the latter rule. In rejecting a contention that subsequent reenactment of a statute construed in a single decision by a lower court was a legislative adoption of such construction, the Supreme Court stated that "one decision construing an act does not approach the dignity of a well settled interpretation." *White* v. *Winchester Club*, 315 U. S. 32; *United States* v. *Raynor*, 302 U. S. 540. The presumption resulting in such a situation may be given little or no weight where, as here, it appears to this court that the Customs Court's decision was intrinsically unsound. See the *White* case, *supra*, at page 40.

The case of a single reenactment subsequent to a decision of the Customs Court is to be distinguished from that wherein subsequent to such a decision Congress has reenacted the construed provision in a series of three or four successive acts. In the latter situation, the doctrine of legislative ratification of judicial construction is controlling in the absence of very compelling reasons to the contrary. The reason for this is that Congress is presumably cognizant of such judicial construction and its consequences, and to hold otherwise in the face of such a series of reenactments would be attributing to that body an unusual indifference or lack of knowledge. That is an attitude to be avoided. *Bentkamp* case, *supra*; *United States* v. *Bassichis, et al.*, 16 Ct. Cust. Appls. 410, T. D. 43133.

In view of the foregoing, we hold, as did the trial court, that the imported tall oil is not classifiable as a waste under paragraph 1555.

We turn then to examine the merits of appellant's alternative claim that the imported tall oil is properly classifiable as a nonenumerated *unmanufactured* article under paragraph 1558, rather than as a non-enumerated article *manufactured,* in whole or in part, under the same paragraph. This claim by appellant appears to be based on the contentions that the ingredients or composition of the imported tall oil consist of a portion of the natural ingredients of the wood of the pine trees, and that the tall oil is produced by a process of isolation only.

We think the evidence of record fails to establish appellant's first contention. Two of the Government's expert witnesses, both well qualified, strongly disputed that the ingredients of the tall oil as such are found naturally in the pine tree. Moreover, one of appellant's witnesses testified that some slight changes might have occurred in the original fatty and rosin acids of the tree during the above-

described process of producing tall oil. Testimony by appellant's witnesses that the oil is produced by a process of isolation only is little more than a legal conclusion with respect to an essential question in the case.

In *McLaughlin & Freeman* v. *United States*, 35 C. C. P. A. (Customs) 34, C. A. D. 368, the importation was a "peanut acid oil" produced from crude peanut oil, which apparently was the basic raw material source of the imported merchandise. The crude peanut oil was subjected to an alkaline water solution of sodium hydroxide, thereby yielding a refined edible peanut oil and a substance called "foots" or "sludge," which were separated by flotation. The sludge, which consists primarily of sodium salts of fatty acids originally present in the crude peanut oil, was then treated with sulfuric acid to yield the imported peanut acid oil consisting of free fatty acids, and that oil was then separated by flotation from the sodium sulfate which also results in this acidulation process. There was conflicting testimony by witnesses for Government and importer as to whether or not the imported oil was precisely the same substance as was naturally present in the original crude peanut oil, although a witness for the Government conceded that the imported product was substantially the equivalent of the peanut acid oil present in crude peanut oil. The question before the court was whether or not the imported oil was an unenumerated manufactured or unmanufactured article, under paragraph 1558 of the 1930 act.

We stated in the *McLaughlin* case that it was immaterial whether or not the imported oil was precisely the same substance as in the crude peanut oil, and whether or not the process of subjecting the crude peanut oil to the alkali solution was a manufacturing process. We held that the acidulation process, by which the peanut acid oil was obtained through conversion of the sodium salts of the fatty acids in the sludge, was not a mere cleaning or isolation process within the purview of *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296, and other cases cited. Rather, we deemed it to be a manufacturing process within the purview of the decisions in the two *American Refining* cases and the *Half Moon* case, *supra*. Accordingly, the imported peanut acid oil was held to be properly classified as a nonenumerated article manufactured, in whole or in part. It is of course implicit in that decision that it was properly so classified irrespective of whether or not the imported oil was a native ingredient of the crude peanut oil.

In *Balfour Guthrie & Co. Ltd.* v. *United States*, 39 C. C. P. A. (Customs) 12, C. A. D. 457, we considered whether fatty acids produced from crude linseed, palm kernel nut, soya bean and corn oil by the Twitchell process of hydrolysis, which comprises heating for 36 hours in the presence of an acid catalyst, were properly dutiable as

nonenumerated manufactured or unmanufactured articles, under paragraph 1558. Those fatty acids were native to their raw material sources at two different stages during growth and decay and could be obtained as a result of natural hydrolysis during decay, although in a far smaller yield than by the Twitchell process. We rejected the importer's contention that by virtue of this occurrence in nature the imported merchandise was an unmanufactured article and held that, regardless of this, the imported fatty acids were manufactured articles and properly so classified by the collector.

We think that the issue before us is controlled by our decisions in the *McLaughlin* and *Guthrie* cases, *supra*. The *McLaughlin* case is particularly apposite, for there is a striking similarity between the question before the court in that case and this one. In our opinion, the imported tall oil has been produced by a manufacturing process comprising the chemical conversion of the fatty acid soaps in the skimmings by acidulating them. Consequently, we hold that the imported article is an unenumerated *manufactured* article within the purview of paragraph 1558, notwithstanding that its ingredients may possibly occur naturally in the pine tree.

Appellant urges that since an importation of identical tall oil obtained directly from the tree by a mere isolation process without resort to the above-described process [6] would be classified as a nonmanufactured article,[7] classification of the imported oil as a manufactured article would lead to an anomalous result. Were we to apply this reasoning of appellant to an interpretation of paragraph 1558, the effect would be to ignore the plain meaning of the language therein contained. The sole basis of distinction between the 10% and 20% duty rates in that paragraph depends on whether the import is unmanufactured, or manufactured, in whole or in part. Thus, it seems clear to us that there is no alternative but to regard the process of producing the imported merchandise as a, if not the, decisive factor in determining which of the two rates is applicable. Hence, we see in this argument no reason for changing our above-stated conclusion.

For reasons hereinbefore set out, we hold that the trial court correctly sustained the action of the collector assessing the imported merchandise as a nonenumerated article manufactured, in whole or in part, and dutiable at 20 per centum ad valorem, under paragraph 1558 of the 1930 act. Accordingly, the decision of the Customs Court is hereby *affirmed*.

JACKSON, J., retired, recalled to participate herein in place of WORLEY, J.

---

[6] There is no evidence in the record as to how this would or could be done, except, perhaps, by an ether extraction referred to very briefly during cross-examination of one Government witness. It is not clear whether that is a commercial process.

[7] We *assume* this legal conclusion by appellant to be correct for the purpose of this discussion.