(C. D. 1742)

A. L. ERLANGER CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 9, 1955)

*John D. Rode* for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Richard M. Kozinn*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: The merchandise the subject of this protest was classified by the collector as "Rayon staple fibre, filaments not exceed-

ing 30″ in length, other than waste," and duty was levied thereon at the rate of 20 per centum ad valorem under paragraph 1302 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. Plaintiff claims said merchandise to be properly dutiable at 5 per centum ad valorem under said paragraph 1302, as modified, *supra*, as "Waste of rayon or other synthetic textile, except waste wholly or in chief value of cellulose acetate."

It was agreed between counsel at the trial that the involved merchandise was a viscose product and not cellulose acetate. Therefore, if it be found that the merchandise in question is a waste of rayon or other synthetic textile, the exception to said paragraph as to cellulose acetate has no application.

The record in this case consists of the testimony of three witnesses for the plaintiff and three witnesses for the defendant, together with several physical and documentary exhibits.

Witness Erlanger testified for the plaintiff that he was president of the plaintiff company; that he had been with this company since 1944 and, prior to that, he was manager of the North American Rayon Corp.; that his experience in the rayon staple fiber industry and rayon wastes added up to approximately 30 years; that, in connection with the business in which he had been engaged, he had visited Europe 100 times in the past 25 years.

After stating that he had visited a number of the mills in Europe which produce rayon staple fiber and rayon waste and that he saw a portion of the involved merchandise and similar merchandise being produced, or as it came into being, the witness testified that the involved merchandise originated as follows:

The staple fiber is usually produced in a huge spinning machine which has something like 200 spinnerets, 100 on each side of a spinning machine, from which the viscose is extruded in the form of staple fiber. Now, right here, before it is staple fiber, occurs a lot of waste right at the spinning place when the laborer starts up the spinning machine and gets the viscose solution, which is a liquid, into a staple or yarn. He has to pick it up from the spinneret, guide it into the spinning solution, and from thereon into a band or tow. Right there occurs a lot of waste. * * * That's called "anlaufware," the beginning of the beginning. * * * From there it goes into a cutting machine where the predetermined length of the staple is cut by rotating knives and the length is determined by the speed of the flow of the tow and the rotation of the knife which hits that tow every so often and then makes a one and one-half, or five, or six denier staple. * * * Then it goes from there into an enormously large washing machine. First it is desulphurized, then it is bleached, then it is washed in various baths, and from there it goes to the drying machine. And from the drying machine it goes to the opener. From the opener it's blown into ducts right to the baling press, and from the baling press it goes to the United States, or wherever it goes. And at each and every one of these places there occurs some waste.

*        *        *        *        *        *        *

JUDGE FORD: One minute. You say that waste does occur, but how does it occur? Will you tell us?

THE WITNESS: In the spinning it occurs before the viscose solution starts flowing regularly enough to produce a first quality product. The laborers who start the machine up throw this viscose which coagulates very fast—they throw it right down on the floor in lumps, and then it is waste. The good thread keeps on flowing, but when they start up, before it is a thread, they throw down on the floor as wastes. It's waste No. 1. If the engineer in the plant should discover that a knife doesn't cut the waste regularly he would stop it and throw out whatever is around there, that it goes into the waste department. And the same occurs everywhere else. Then, furthermore, when they change—when the factory changes from one denier to another then all these long lengths, about 300 feet long, probably, that have to be cleaned out, and everything that sticks to the machines, to the rollers, to the blowers, that has to be removed and goes into waste. Then, even in the baling process, these are hydraulic presses where this very material is compressed into three, four hundred pound bales, something spills over the bales, falls down on the floor. That goes into waste, because the factory cannot take any chance having an impure fiber sold as staple fiber because it may, as it goes on into the other manufacturing processes, it may cause even more trouble, and therefore they sell everything which is not 100 percent staple as waste.

This witness further testified that, during his business experience, he had handled millions of pounds of rayon staple fiber; that viscose staple fiber is a fiber of predetermined denier and length, cut; that rayon staple fiber must have a definite denier; that it must have a definite staple or length which must be uniform; that it must have a certain luster; that these lusters come in bright, semidull, and dull, but the luster must be uniform; that it must spin well for the purpose for which it was made; that it must have a certain tensile strength in order to be spinnable, otherwise you would produce a very poor yarn, a very poor cloth, whatever you make out of it; and that, if the staple is not uniform, there would be a lot of waste in the spinning operations, because it does not fit the respective spinning machine for which it was intended, since the spinning machines are geared to take certain lengths of staple.

With reference to the characteristics of the involved merchandise, witness Erlanger testified that it was not uniform in denier; that it was not uniform in cut or staple; that it was not uniform in luster. "It was waste and therefore it was not uniform, probably, in any respect as far as quality of staple fiber is concerned." The witness further testified that the involved merchandise certainly would not be a good delivery for rayon staple fiber.

Arthur M. Basch, appearing for the plaintiff, testified that he had been dealing in synthetic fibers, such as rayon, nylon, orlon, and dacron, throughout the United States, since these items have been an article of commerce covering a period of some 30 years; that uniformity was a requirement of staple fiber; that "It is the basis of the main

claim of any rayon producer I have ever heard of"; that that uniformity applies to denier, to length, to "* * * luster, such as high, semi, or dull luster, and an absolutely demanded, strict adherence to certain known propensities"; that staple fiber is usually bought and sold with a definite specification as to denier, as to length, and, in practically every case, pointing to domestic production, with a certain given dye index number, which means its ability or dye program; that, by no stretch of the imagination, would waste be a good delivery for staple fiber; and that the distinction between rayon waste and rayon staple fiber exists throughout the world, and particularly in the United States.

George Cohen testified for the plaintiff that his company had been in the business of textile fibers as dealers, converters, and importers since 1931, and that he had been in the same line of business since 1916; that he had bought and sold rayon staple fiber; that he had bought and sold rayon waste; that he had handled imported staple fiber; imported rayon waste, domestic staple fiber, and domestic waste; that "It would go on the average into the millions of pounds" per annum; that "I would characterize staple fiber waste as waste produced in the manufacture of staple fiber, at different intervals in the manufacture of the fiber there will be waste produced due to some imperfection or some quirk of the machinery or some intangible that you can't see when you start the operation"; that "In selling waste you sell it as waste. Waste can be sold in many forms. You can take the broadest form and sell waste as is, or if the man has definite requirements you might try to define that waste a little better for him so he can find a better use for it. But generally waste is sold as waste."

The witness also testified that:

Rayon staple fiber definitely has to be sold with a code index because if you mix two codes and you manufacture a piece of cloth and dye it, you are going to get shaded material, you are going to get a variation in color due to the fact that one code number to another code number, even though they use the same chemicals, there may be some difference in chemical reaction to the dyes when you mix the two together.

William W. Bowman testified for the defendant that he was with the American Viscose Co., head of the cotton division in charge of staple processing on the cotton system. He also gave testimony as to the various grades of staple fiber and of rayon waste, as set up by the American Viscose Corp. This witness was interrogated and answered as follows:

Q. Does American Viscose produce a staple fiber in substantially the same manner as described by Mr. Erlanger?—A. Yes, sir.

Q. Witness Erlanger testified with respect to the first run-off and wherein the so-called wastes occur. Would you please describe to the court wherein in the

American Viscose plant in the first run-off, which occurs at the bale press, what is done with that merchandise?—A. The first bale that is made, which takes 10 to 15 minutes to make, normally, is degraded to either B–1, 2, 3, 4, staple or graded further to a C–quality staple because we have found through years of experience that the initial production of rayon staple could, and most of the time does, contain a small amount of long or short fiber or splinters.

Q. Now, where the so-called waste occurs at the cutting machine, could you please describe what happens to that merchandise?—A. The cut filaments which are then staple and gathered at the cutting machine are processed in the normal fashion on a smaller type of machine essentially the same as the larger type into the finished product. Any tow that is pulled off prior to entering the cutter is also processed and then cut into length and sold.

Q. How is that merchandise sold?—A. As the opened staple waste, WN–10, with the various classifications which I have already given.

Q. Mr. Erlanger testified with respect to the so-called waste at the spinneret. Would you please describe to the court what happens there and what happens to the merchandise at that time?—A. The material that is gathered at the spinneret is thrown out on the dumpers as just explained, unuseable waste of no value to us or to our customer at the present time.

Q. What is actually done with that?—A. It's thrown on the dump.

Q. Is it sold at all?—A. To the best of my knowledge it is not sold at all.

On cross-examination, this witness was asked the following question:

X Q. If you had a heterogeneous mixture of all the wastes or all the inferior grades, as you call them, at the various stages, and they are mixed together, and there is no separation or no segregation, would you call that an inferior grade of staple fiber or would you call it a staple fiber waste?

to which the witness gave the following answer:

A. I would feel that that staple would fall in our WN–10 classification as staple waste.

\* \* \* \* \* \* \*

X Q. What is the distinction between C, the various C off-grades, and the lowest, if you will, and the beginning of a WN grade?—A. It's hard to say, sir, what the lowest grade of C may be because to one mill long staple may be most objectionable, to another mill short staple may be the most objectionable feature.

X Q. Wait a minute. To whom?—A. To one mill long staple may be most objectionable, to another short staple may be most objectionable. So therefore I am unable to take the lower classification of C. But C staple is processed in a normal fashion into staple, into bale form,. and degraded after baling by the laboratory based on analysis. Staple becomes staple waste when it is gathered at the drying in a cleaning-out period or when it is collected at the floor at any point of process. And if it's at the dryer it requires no further processing. If it is prior to the drying operation it is further processed and it becomes a waste.

\* \* \* \* \* \* \*

X Q. \* \* \* Do you know whether or not some of your degraded fibers would be known by other manufacturers or classified by other manufacturers not as a degraded but as waste? \* \* \*—A. How they classify it I don't know.

The witness was interrogated by the court and answered as follows:

JUDGE LAWRENCE: What is the next process after the spinneret?

THE WITNESS: After the spinneret it is wrapped around a godet wheel.

JUDGE LAWRENCE: Is there any physical loss in that process?

THE WITNESS: Yes, sir.

JUDGE LAWRENCE: Is that a waste product?

THE WITNESS: Yes, sir.

\*      \*      \*      \*      \*      \*      \*

JUDGE LAWRENCE: In that cutting is there a physical loss of material?

THE WITNESS: ˙Yes, sir.

JUDGE LAWRENCE: Is that waste?

THE WITNESS: Yes, sir.

\*      \*      \*      \*      \*      \*      \*

JUDGE LAWRENCE: And in what other process was there a physical loss?

THE WITNESS: There is a physical loss picked up when we change from one denier or one length to another when staple fiber is gathered at the projections or at points where it's rough in the process. And that is collected together.

\*      \*      \*      \*      \*      \*      \*

JUDGE LAWRENCE: So all of the by-product up to this time is a waste product, is it not?

THE WITNESS: We classify most of that as a waste known as WN–10, which is an open staple waste, yes, sir.

Robert Allen Smith and George W. Waiting also testified for defendant, both of whom are connected with the American Viscose Corp. The testimony of these two witnesses is in substantial accord with the testimony given by William W. Bowman, and in no material respect is it in conflict therewith. We have given careful consideration to the testimony of Mr. Smith and Mr. Waiting, but do not deem it necessary to give a detailed summation of the same here.

The record shows that neither of the three witnesses who testified for the defendant herein had ever made a purchase or sale of rayon staple fiber or of waste of rayon, except when its classification as rayon staple fiber or as waste of rayon had been predetermined by the American Viscose Corp., according to its own standards. One witness testified that if exhibit 2 herein were classified by the American Viscose Corp. as waste, he would sell it as waste. To accept such a classification as binding upon us in this case, would permit an American company to arbitrarily adopt a given classification for its products and thereby force the classification of all similar imported merchandise to be governed by such arbitrarily adopted classification. We have not been cited to, nor have we been able to find, any authority supporting such a position. Our conclusion on this point is not contrary to the well-settled rule or principle that the classification of imported merchandise is to be governed by the designation and use of such merchandise in the trade and commerce in the United States.

In *Elliott* v. *Swartwout*, 10 Peters 137, the Supreme Court of the United States held as follows:

\* \* \* Whether a particular article was designated by one, name or another, in the country of its origin; or whether it were a simple or *mixed* substance; was of no importance in the view of the legislature. It applied its attention to the

description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic; and it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life.

In *Patton* v. *United States,* 159 U. S. 500, after referring to a number of definitions of waste, the Supreme Court of the United States said:

* * * The prominent characteristic running through all these definitions is that of refuse, or material that is not susceptible of being used for the ordinary purposes of manufacture. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable.

\* \* \* \* \* \* \*

If the ordinary definition of "waste," as refuse matter thrown off in the process of manufacture, is to control, it is quite clear that the importations in question are not susceptible of this meaning. The common definition of "waste" lends no support to the theory of the defendants.

\* \* \* \* \* \* \*

We are also of opinion that the importations in question cannot be considered as manufactures of wool. Assuming that the tops, before being broken up, represented a stage in the process of converting the wool into cloth, which would entitle them to be considered as manufactures; if the tops be reconverted into wool, so that the process has to be gone through with again, the wool loses its character as a manufacture and resumes its character as wool, even though it acquires the new commercial designation of waste. Waste in its ordinary sense being merely refuse thrown off in the process of converting raw wool into a manufacture of wool, cannot be considered a manufacture simply because it acquires a new designation, and if it be artificially produced by the breaking up of the tops it is with even less reason entitled to be so considered. Unless natural waste can be treated as a manufacture, artificial waste should not.

The involved merchandise, after it had been taken from the machines, in order to permit such machines to produce merchantable staple fiber, or after it had been removed from the floor where it had fallen as an offal, was not subjected to any manufacturing process prior to importation.

In *Salomon Bros.* v. *United States,* 2 Ct. Cust. Appls. 431, T. D. 32196, in dealing with an issue similar to that here involved, the Court of Customs Appeals epitomized its decision in the syllabus, as follows:

The merchandise consists of broken fibers of undressed raw jute rejected by the carding machine in the first process of manufacture. *These broken fibers had been later subjected to a carding process of their own.* The product is more accurately described as jute, unmanufactured, than as waste not specially provided for and was entitled to free entry under both tariff acts of 1897 and 1909. * * * [Italics ours.]

It is clear from the above quotation that the merchandise in the *Salomon* case was held dutiable as jute, unmanufactured, because the broken fibers of undressed raw jute rejected by the carding machine in the first process of manufacture were thereafter subjected

to a carding process of their own. In the instant case, the fibers which were rejected by the machine in the process of manufacture and those fibers which fell to the floor and lodged in the machines during the process of manufacture were not thereafter subjected to any manufacturing process.

In *Ishimitsu* v. *United States*, 12 Ct. Cust. Appls. 477, T. D. 40672, the Court of Customs Appeals held that nigari, an unsought residue obtained in the manufacture of salt, was a waste, employing the following language:

* * * It is shown in this case that the object of the manufacturing process is to produce salt and that the production of nigari is only an incident of the salt making; that in the production of the nigari there was no manufacturing effort put forth for the purpose of producing nigari. Under the decisions of this court, too numerous and too much in general agreement to require citation, we do not think the importation is a manufactured article.

Again, in *Kamikawa Bros.* v. *United States*, 15 Ct. Cust. Appls. 12, T. D. 42130, in passing upon the question of whether sake lees were a waste, the Court of Customs Appeals made the following observation:

It is very evident that the material in question in this case at bar is a waste. No manufacturing effort is put forth either to make it or to recapture it. As a matter of fact, the evidence seems to show that the principal problem seems to consist in disposing of it in any way. The fact that it may have some commercial value does not alone remove it from the classification of waste. It has neither the characteristics of the raw material nor of the finished product and is unsuited for the purposes of either. * * *

In passing upon what was, and what was not, a manufacture, in the case of *Seeberger* v. *Castro*, 153 U. S. 32, the Supreme Court of the United States said:

* * * The court below found in this case that the scraps were "clippings from the ends of cigars and pieces broken from the tobacco of which cigars are manufactured in the process of such manufacture; that said clippings and pieces are not fit for any use in the condition in which the same are imported, and that their only use is to be manufactured into cigarettes and smoking tobacco." It is thus evident that the clippings are the mere waste resulting from a process of manufacture, and not in themselves manufactured articles. * * * In *Holden* v. *Clancy*, 58 Barb. 590, the test of whether an article was manufactured is thus defined: "A manufacture is defined as the process of making anything by art, or of reducing materials into a form fit for use by the hand or by machinery; and it seems to imply a proceeding wherein the *object* or *intention* of the process is to produce the article in question. The residuum or refuse of various kinds of manufactories is more or less valuable for certain purposes, and may be, and often is, the subject of sale; but it is not expected that the skill and attention of the manufacturer is to be devoted to the quality of the refuse material. This is not the object of the process, and its quality is wholly subordinate and disregarded, when attention to it would interfere with the most profitable mode or material to be used in the process which is the main object of the manufacturer." Tested by either of these definitions, the tobacco in question is unmanufactured. To speak of it as "partly manufactured," and deduce a contention therefrom, is simply to assume the question at issue.

The amended paragraph, *supra*, under which the classification was made in this case, reads as follows:

Filaments of rayon or other synthetic textile, not exceeding thirty inches in length, other than waste, whether known as cut fiber, staple fiber, or by any other name.

By the language employed in modifying said paragraph 1302, the trade negotiators made it clear that they recognized the fact that there were "Filaments of rayon or other synthetic textile, not exceeding thirty inches in length," which were waste. Otherwise, there would have been no occasion for the exception "other than waste" from said amended paragraph.

This record contains no contradiction of the testimony of witness Erlanger to the effect that the involved merchandise consists of a heterogeneous mixture of all the wastes, or all the inferior grades, at the various stages, and they are mixed together, and there is no separation or segregation thereof. Witness Erlanger was the only witness testifying with any knowledge as to how the involved merchandise had its origin or came into existence. Witness Bowman admitted that American Viscose Corporation's classification WN–10 was a waste and that merchandise which had its origin or came into existence, as testified to by witness Erlanger, "* * * would fall in our WN–10 classification * * *." It thus appears that the defendant's principal witness agrees with the witnesses for the plaintiff that the involved merchandise is waste.

The testimony of witness Bowman, set out immediately above, is fully corroborated by the answers he gave when interrogated by Judge Lawrence, heretofore quoted.

Upon a full consideration of the record and authorities set out herein, we are of opinion that the involved merchandise does not fall within the provision for "Filaments of rayon or other synthetic textile, not exceeding thirty inches in length, other than waste, whether known as cut fiber, staple fiber, or by any other name." The evidence, in our opinion, brings the involved merchandise squarely within the provision in said trade agreement, *supra*, for "Waste of rayon or other synthetic textile," dutiable at 5 per centum ad valorem, and we so hold. Judgment will be rendered accordingly.