(C.D. 4406)

E. DILLINGHAM, INC. *v.* UNITED STATES

44

Court No. 71–8–00856

(Decided February 7, 1973)

*Tompkins & Davidson* (*Allerton deC. Tompkins* and *Allan H. Kamnitz* of counsel) for the plaintiff.

*Harlington Wood, Jr.,* Assistant Attorney General (*Jordan J. Fiske,* trial attorney), for the defendant.

RAO, Judge: The merchandise involved in this case was entered at the port of Alexandria Bay, N.Y. on various dates in 1970 and 1971. It is described on the invoices as dull or semi-dull "nylon 66, advanced waste in tow form". It was assessed with duty under item 309.30, Tariff Schedules of the United States, as modified by Presidential Proclamation 3822, T.D. 68–9, as grouped filaments of man-made fibers, in continuous form, valued not over 80 cents per pound, at 11.9 cents or 10 cents per pound, depending upon the date of entry. It is claimed to be dutiable at 10 per centum or 9 per centum ad valorem under item 309.75 of said tariff schedules, as modified, as advanced waste of man-made fibers, other than garnetted fibers.

The pertinent provisions of the tariff schedules, as modified, are as follows:

Schedule 3

Part 1. TEXTILE FIBERS AND WASTES; YARNS AND THREADS

Part 1 headnotes:

1. For the purposes of this part—
(a) the term "waste" means all fiber, yarn, and thread wastes, including wastes obtained in the production of continuous and noncontinuous fibers, yarns, and threads, such as gin motes, scutcher waste (including tow), picker waste, card waste, top waste, comber waste (including noils), hackling waste (including tow), sliver waste, roving waste, ring waste, throwster (twister or plyer) waste, fly, sweepings, and willowed wastes, and including fiber, yarn, and thread wastes obtained in the production of other textile products (i.e., products other than fibers, yarns, or threads) or otherwise obtained; and
(b) the term "advanced waste" means any of the above-mentioned wastes which have been cleaned, bleached, colored, or otherwise advanced, and includes fibers recovered by cleaning (except willowing), degumming, carbonizing, cutting, pickering,

garnetting or similar processes from any of the above-mentioned wastes or from textile clippings or articles, new or used, whether or not such fibers or the wastes from which recovered have also been otherwise advanced, but does not include fibers which have been carded, combed, or similarly processed, or reusable yarns or threads.

\* \* \* \* \* \* \*

Subpart E. – Man-made Fibers

Subpart E headnotes:

\* \* \* \* \* \* \*

3. \* \* \*

\* \* \* \* \* \* \*

(e) the term "grouped filaments and strips" embraces two or more filaments or strips, as defined in (a), (b), (c), and (d) of this headnote, grouped together with the filaments or strips substantially parallel and not twisted, but the term does not include grouped filaments which have been subjected to processes such as twisting and untwisting, false twisting, crimping, and curling, and which are usable as yarns;

\* \* \* \* \* \* \*

(g) the term "in continuous form," as used with reference to filaments and strips, refers to such articles when over 30 inches in length;

\* \* \* \* \* \* \*

Grouped filaments and strips (in continuous form), whether known as tow, yarns, or by any other name:
 Wholly of grouped filaments (except laminated filaments and plexiform filaments):
 Of glass:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 309.30 | Other: | |
| | Valued not over 80 cents per pound _____ | 11.9¢ per lb. [or 10¢ per lb.] |

\* \* \* \* \* \* \*

Waste, and advanced waste, of manmade fibers:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| | Advanced: | |
| \* \* \* | Garnetted fibers_____ | \* \* \* |
| 309.75 | Other _____ | 10% ad val. [or 9% ad val.] |

It is admitted by the pleadings that the merchandise consists of a conglomeration of uncrimped nylon materials of mixed deniers, mixed lusters, mixed shades, mixed cleanliness, snarls, broken filaments, irregular draw ratio, and faulty dye affinity. Plaintiff alleges that the material is nylon waste yarns no longer usable as yarns and defendant that it is grouped nylon filaments.

Plaintiff's first witness was Abraham J. Rosenstein, president of Hartford Spinning (Canada), Ltd., the producer of the imported merchandise. He has been responsible for the purchase, sale and manufacture of his firm's products since 1955. He had previously served as president of Hartford Spinning, Inc. of Unionville, Connecticut, and as president of Myrtle Knitting Mills, and had been associated with a research and development company which developed texturized yarns. As a result of his experience, he was familiar with man-made fibers and their subsequent processing except the chemical production of the fiber.

Mr. Rosenstein had visited the factory of DuPont Company of Canada, Ltd. from whom the raw materials for the imported merchandise were purchased. He described the method of production as follows: A polymer in liquid form was forced through a disc or spinneret with 20 little holes in it, and 20 very fine hair-like filaments came out. They were in an undrawn state in various sizes, were taken up on packages, passed on to a draw twister, and subjected to a drawing process. Most of the elasticity was taken out and the filaments were given about a one-half turn or twist per inch to hold or compact them together. They were taken up on pirns or bobbins.

The purpose of the DuPont plant which the witness visited was to produce nylon yarn and nylon staple fiber. He said that the yarns produced are given a very rigid inspection for tenacity, strength, uniformity of denier, and the number of broken filaments in any given pound. The material is then rated first quality, second quality, third quality, and waste yarn not suitable for use in any kind of weaving or knitting. Defective merchandise is segregated in a separate area of the plant and designated as waste yarn. An illustrative sample was received in evidence as exhibit 1. It consists of a bobbin on which fibers are neatly wound except at the end where the material is fuzzy and tangled. The witness had previously examined the sample and testified that it had been subjected to a twisting process and had roughly a half-turn twist per inch. He said that it consisted of damaged material, yarn waste not suitable for yarn use. From a visual inspection he determined that the winding at one end of the bobbin and the small size of the package would make it impossible to use the material as a regular yarn. He explained that because of the high speed production of knitted or woven fabrics, small packages could not be utilized, as a shutdown

would be necessary every time a package ran out and a new one had to be tied in. The packages his firm received from DuPont varied in size depending upon the point at which the defect was discovered and production cut off.

According to the witness, waste yarn could be cut or aspirated from the bobbins or processed by the creel method which his firm used. Thread waste obtained by the first two methods must be garnetted, and for some uses, also subjected to pin drafting or gilling to make the fibers parallel. It could then be utilized to make flock, or, after further refining and processing, yarns.

Merchandise like exhibit 1 is purchased by Hartford as creelable waste yarn and is processed by taking as many as 200 bobbins in various sizes and forms and loading them on pegs in a creel. The ends of the yarns are pulled across a guide rail onto a winding unit making it into the form of a little sliver. This method by-passes garnetting. During the process as one piece of material runs out another is spliced in by shooting a blast of air through three sections of the overlapping material. This creates fiber entanglement and locks them together. In a sample (exhibit 5), some of the fibers appear more or less parallel but they are interrupted by what looks like a knot, and is a joining or splice. It creates problems for the customer in using the product but is unavoidable. The small sliver, which is a grouping of fibers, is then combined with 15 or 20 other slivers into a larger sliver, such as exhibit 6, approximating some arbitrary denier, such as half a million or 450,000.

This material is then packed in a carton by the use of a mechanical arm or piddler which snakes the material back and forth so as to avoid entangling it within itself and so that it can be withdrawn from the carton by the customer. Sometimes a sliver breaks and then another is spliced on in order to fill up the case. Another sample of the merchandise, consisting of somewhat tangled mass of fibers, tied together, was received in evidence as exhibit 8. The witness said that the merchandise as shipped was neatly folded into the carton and that exhibit 6, which is a portion of the material wrapped around cardboard, more nearly resembles the imported product. Both exhibits 6 and 8 have the defects of the material in the form of exhibit 1, including soil defects, broken filaments, irregular denier, snarls, and dye affinity, that is, the material cannot be dyed uniformly.

Mr. Rosenstein testified that merchandise such as exhibits 6 and 8 is a waste nylon sliver, not capable of use in spinning, weaving, knitting or braiding, without further processing. For spinning, the fibers would have to be crimped. He stated that the material could be crimped but that that would not be commercially feasible.

The witness stated that the material was not tow as that is known in the trade on the ground that tow is a large mass of filaments, not twisted, uniform in luster, denier, tenacity, and total denier. It is a free grouping of filaments. Finishes may be applied to keep the filaments together and certain wrappers are used to keep the material from snarling, but it is not twisted.

Exhibits 6 and 8, however, are yarns containing filaments that are twisted. They are not groups of free filaments. The filaments are not substantially parallel since they have been twisted. It is not in tow form although there is a similarity of appearance.

Plaintiff's second witness was David I. Walsh, senior vice-president of Microfibers, Incorporated, the purchaser of the imported merchandise. His duties include sales, product development, and quality control relating to flock manufacture, as well as designing, building, and selling machines to produce flock.

Mr. Walsh testified that he has seen and supervised the processing performed by his firm on merchandise like exhibits 6 and 8 (the Hartford material). Three or four cartons of such material are combined with eight or nine cartons of virgin first quality tow (obtained from DuPont) in a "tow range" to make flock. Only 30 percent of the Hartford material can be used since more than that will not go through the equipment without fiber wrap-ups, breaks, and stoppages which make it economically impractical to use 100 percent Hartford material. The DuPont material helps to carry the Hartford material through the tow range. Because of splices, use of the Hartford material contributes to snag ends, snarls, production stoppages and miscuts. Flock made with 100 percent Hartford material is not an acceptable product. Nevertheless, because of material scarcities, it is economically feasible to use the Hartford product with tow to produce flock.

Defendant called Newell D. Hale, who for 18 years has been vice-president in charge of sales and administration of the Hale Manufacturing Company, processors of synthetic fibers, spinners, dyers, and weavers. His firm made nylon staple, nylon tow, and sold nylon waste and other tow and wastes. It weaved filament and spun goods, and spun yarn on the woolen system. Mr. Hale has been a director of the Northern Textile Association for 4 years.

The witness stated that he was familiar with merchandise like exhibit A (another illustrative sample of the imported merchandise) because his firm has manufactured a similar product since 1959 from raw material such as exhibit 1. He would describe and sell it as continuous tow because the fibers are over 30 inches in length, and are relatively parallel. He considered the yarns in exhibit A to be substantially parallel for the end use. He considered the filaments substantially parallel even though they were twisted on the ground that a half twist

does not hurt parallelization any more than the piddling process does. He said that yarns would normally have a twist but grouped filaments would not.

He considered merchandise like exhibit 1 to be off quality or re-classified yarns, and not waste because it is still in continuous form. The fact that it was not good quality or had varying lusters and deniers would not make it waste. It would be waste if it were slit with a knife and thrown in tangled condition into a carton or messed up with a pitchfork. Then it could not be taken out of a carton or off a ball warp without being tangled and would have to be garnetted or re-melted into fiber.

According to the witness, merchandise like exhibit 1, if not too tangled, could be woven. Otherwise, it would have to be turned into a product like exhibit A, or air stripped and turned into waste. Merchandise like exhibit A, could be crimped, cut, and made into nylon staple for spinning on either the cotton system or the wool system or it could be turned into flock. In his opinion, crimping merchandise some-thing like exhibit 1 would be an easy process. The witness also stated:

> We buy this raw material on a steady basis, basically, from one company and sometimes from various nylon producers. We buy it, analyze the product, analyze the market to determine whether it is more profitable for the manufacturer to put it into staple or put it into weaving, weaving filament, industrial cloths, or whether the bobbins that come over are so poor that we can't make a tow. And, in that case, we strip them.

In the opinion of the witness exhibit 1 is a yarn but once it goes through the creeling process, it loses its character as yarn and is only a group of filaments. It could not be used as yarn. It could not be used for spinning or weaving without further processing. As is, it could be used only as a stuffer with braid around it. In his opinion, neither ex-hibit 1 nor exhibit A is waste even though defective.

Plaintiff has the two-fold burden in the instant case of proving that the classification of the merchandise as grouped filaments by customs officials is incorrect and of establishing that the claimed classification as advanced waste is proper. *Bob Stone Cordage Co. et al.* v. *United States*, 51 CCPA 60, 65, C.A.D. 838 (1964) ; *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, 72, C.A.D. 935 (1968).

The first question then is whether the imported merchandise is "grouped filaments" within the meaning of the tariff schedules. The definition of said term in headnote 3(e), schedule 3, part 1E, *supra*, requires that the merchandise consist of two or more filaments, grouped together, with the filaments substantially parallel and not twisted. The term does not include grouped filaments which have been subjected to processes such as twisting and untwisting, crimping and curling, which

are usable as yarns. According to the superior heading to item 309.30, the name or designation of the merchandise, as tow, yarn, or otherwise, is immaterial.

The material involved here when first extruded from the spinneret consisted of filaments. They were given a half twist per inch, which, according to the witness Rosenstein, converted them into yarns. He said the filaments in the imported merchandise were not substantially parallel since they had been twisted. Mr. Hale's view was that in the creeling process the material had ceased to be yarn but had become grouped filaments and that the filaments were substantially parallel in spite of the twist.

The definitions in the headnotes to schedule 3, part 1E, make arbitrary distinctions on the basis of the physical form of man-made fibers. Form rather than use is the criterion, in contradistinction to the provisions in paragraph 1301 of the Tariff Act of 1930. Tariff Classification Study, November 15, 1960, Schedule 3, pp. 44–51; *LeJeune, Inc.* v. *United States,* 67 Cust. Ct. 301, C.D. 4289 (1971) ; *Wedemann & Godknecht, Inc., a/c Burlington Industries, Inc., et al.* v. *United States,* 59 Cust. Ct. 475, C.D. 3199, 275 F. Supp. 1017 (1967), *appeal dismissed* 55 CCPA 115 (1968).

As to grouped filaments, the Tariff Classification Study, Schedule 3, pp. 47–48, 50, states:

> Headnote 2(e) [now 3(e)] relates to "grouped filaments and strips". The provisions of paragraph 1301 [Tariff Act of 1930] for grouped filaments relate to the so-called "zero-twist" filaments. Grouped filaments in the provision applicable to such filaments of 150 denier or more include the so-called "tow" used in the production of staple for spun yarns. The provisions in paragraph 1301 also include such filaments of denier sizes usable as "zero-twist" yarns. The headnote excludes from grouped filaments those "which have been subjected to processes such as twisting and untwisting, false twisting, crimping, and curling, and which are reusable as yarns." This language is included to clarify the status of so-called "texturized" yarns some of which when under tension have filaments that are substantially parallel but when relaxed show the effects of the special processing.
>
> \* \* \* \* \* \* \*
>
> Mention has been made above that the provisions in paragraph 1301 for grouped filaments relate to the "zero-twist" filaments and include the so-called "tow" used in the production of staple for spun yarns and also include denier sizes usable as yarns. The grouped filaments covered include "tow", "yarn" or other filaments, so long as the filaments in the group are "substantially parallel and not twisted". This language, of course, is not intended to preclude the classification under these provisions of grouped filaments with a slight twist unintentionally introduced in the process of winding such filaments on holders.

The instant merchandise contains filaments grouped together, but the filaments have been twisted and are not substantially parallel. Under the statutory language, the amount of the twist is not significant. Although well aware that there were materials known as "zero-twist" yarns, and that twists varied, Congress did not provide a classification based on the amount of twist or the use of the merchandise. If the filaments are twisted, they are not grouped filaments according to the definition. The Tariff Classification Study indicates that where the twist is slight and unintentionally introduced in the process of winding on holders, it may be disregarded. However, there is no evidence in the instant case that the twist was unintentional. According to the record, the twist was imparted by the draw twister to hold the filaments together and not incidently in the course of winding on holders.

There is no evidence that the twist was removed in the creeling process. On the contrary, during the operation the material was spliced from time to time, entangling the fibers or filaments so that they could not be substantially parallel throughout. In referring to the splicing operation, Mr. Rosenstein testified at one point that it entangled the filaments and in another that it entangled the fibers. It is unlikely that it could have left the filaments substantially parallel, even if they had not been twisted. Therefore, the merchandise as imported did not become grouped filaments after creeling.

In view of the definition and the evidence presented, I conclude that the imported merchandise is not classifiable as grouped filaments.

The next question is whether it is properly dutiable as advanced waste, other than garnetted fibers.

Waste, insofar as schedule 3, part 1 is concerned, means all fiber, yarn and thread wastes, including wastes obtained in the production of continuous fibers, yarns, and threads and those obtained in the production of other textile products. Headnote 1(a), schedule 3, part 1, *supra.*

Waste, under tariff statutes, does not presuppose that an article is absolutely worthless, but that it is not susceptible of being used for the purposes for which merchantable material of the same class is suitable. *Patton* v. *United States*, 159 U.S. 500 (1895). In an oft-quoted statement in *Harley Co.* v. *United States*, 14 Ct. Cust. Appls. 112, T.D. 41644 (1926), the court said (p. 115):

> In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else. It also includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for

which the original material was suitable and from which material such refuse, surplus, or unsought residuum was derived. The latter class of waste might be appropriately designated as new waste and includes such things as *tangled spun thread*, coal dust, broken or spoiled castings fit only for remanufacture. * * * [Emphasis supplied.]

More recently, in *United States* v. *David Studner et al.*, 57 CCPA 122, C.A.D. 990, 427 F.2d 819 (1970), it was held that old printing blocks incapable of use for their original purpose of printing, but which were sold and used, without further manipulation, as wall decorations, were waste, even though it was not necessary to remanufacture them for their new use.

In *Cheltenham Supply Corp.* v. *United States*, 63 Cust. Ct. 271, C.D. 3908, 306 F. Supp. 472 (1969), cellophane manufactured for use for packaging foods that were to be frozen, which was so defective as to be unsatisfactory for that purpose, but which was processed for a new use, was held to be waste because it could not be utilized as originally intended. According to the record, it had no use whatever prior to its remanufacture. Although its subsequent use was for wrapping and packaging products other than frozen foods, the court held that there was a vast difference between those uses and the original intended use.

As to textile materials, it has been held that mixed wastes thrown off at various stages of manufacturing rayon staple fiber, not uniform in denier, cut, luster, or color, and not good delivery for rayon staple fiber, were classifiable as waste of rayon. *A. L. Erlanger Co., Inc.* v. *United States*, 35 Cust. Ct. 189, C.D. 1742 (1955); *Dolliff & McGrath* v. *United States*, 40 Cust. Ct. 560, Abstract 61961 (1958). *Contra*, where the wastes were separated and could be spun without further processing, or where the yarn, although damaged, had all the characteristics of yarn and could be used for some purposes without further processing. *Alintex, Inc., et al.* v. *United States*, 53 CCPA 94, C.A.D. 883 (1966); *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 56 Cust. Ct. 274, C.D. 2638 (1966).

In the instant case, the weight of the evidence indicates that merchandise like exhibit 1 was defective and could not be used for its original purpose as yarn without further processing. It had to be cut or aspirated from the bobbins and garnetted or subjected to other processes, or made into a product like exhibits 6, 8, and A by the creeling method. Its subsequent use, after processing, as a component material with virgin tow in making flock is vastly different from its intended purpose as yarn.

While Mr. Hale said that merchandise like exhibit 1 could be woven, he admitted that if it were too tangled, it could not be, and would have to be made into a product like exhibit A or air stripped and turned into

what he called waste. In his view waste was material not in continuous form, was tangled, and could not be pulled out of a carton or off a ball warp. This is not in accord with the construction of the term waste for tariff purposes. Where he would draw the line between merchandise which could be woven and that which was too tangled for that purpose was not brought out in his testimony. His firm apparently bought a variety of raw materials and then decided, after inspecting them and analyzing the market, what it would be most profitable to produce.

The imported merchandise has been advanced from the condition of exhibit 1 by the creeling process, but it is still waste, not usable for spinning or weaving without further manufacture. The only possible use for the merchandise as is, which was mentioned by Mr. Hale, is as a stuffer. Even in manufacturing flock, it could only be used in a limited quantity and combined with virgin tow in order to make a commercially acceptable product. Such merchandise falls within the definition of "advanced waste" in headnote 1(b), schedule 3, part 1, *supra*, having been further processed by a method which by-passes garnetting but results in a commodity similar to waste which has been garnetted, and is not usable for its original purpose. Since it has not in fact been garnetted, it is classifiable as other advanced waste under item 309.75, *supra*.

The claim that the imported merchandise is properly dutiable at 10 per centum or 9 per centum ad valorem, depending upon the date of entry, under item 309.75, Tariff Schedules of the United States, as modified, as advanced waste of man-made fibers, other than garnetted fibers, is sustained. Judgment will be entered accordingly.